*666 Justice Alito
delivered the opinion of the Court.
We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are “silent” on that issue is consistent with the Federal Arbitration Act (FAA), 9 U. S. C. § 1 et seq.
I
A
Petitioners are shipping companies that serve a large share of the world market for parcel tankers — seagoing vessels with compartments that are separately chartered to customers wishing to ship liquids in small quantities. One of those customers is AnimalFeeds International Corp. (hereinafter AnimalFeeds), which supplies raw ingredients, such as fish oil, to animal-feed producers around the world. Animal-Feeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party.[1] Numerous charter parties are in regular use, and the charter party that AnimalFeeds uses is known as the “Vegoilvoy” charter party. Petitioners assert, without contradiction, that charterers *667 like AnimalFeeds, or their agents — not the shipowners— typically select the particular charter party that governs their shipments. Accord, Trowbridge, Admiralty Law Institute: Symposium on Charter Parties: The History, Development, and Characteristics of the Charter Concept, 49 Tulane L. Rev. 743, 753 (1975) (“Voyage charter parties are highly standardized, with many commodities and charterers having their own specialized forms”).
Adopted in 1950, the Vegoilvoy charter party contains the following arbitration clause:
“Arbitration. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act [i e., the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator.” App. to Pet. for Cert. 69a.
In 2003, a Department of Justice criminal investigation revealed that petitioners were engaging in an illegal price-fixing conspiracy. When AnimalFeeds learned of this, it brought a putative class action against petitioners in the District Court for the Eastern District of Pennsylvania, asserting antitrust claims for supracompetitive prices that petitioners allegedly charged their customers over a period of several years.
Other charterers brought similar suits. In one of these, the District Court for the District of Connecticut held that the charterers’ claims were not subject to arbitration under the applicable arbitration clause, but the Second Circuit reversed. See JLM Industries, Inc. v. Stolt-Nielsen S. A., 387 *668 F. 3d 163, 183 (2004). While that appeal was pending, the Judicial Panel on Multidistrict Litigation ordered the consolidation of then-pending actions against petitioners, including AnimalFeeds’ action, in the District of Connecticut. See In re Parcel Tanker Shipping Servs. Antitrust Litigation, 296 F. Supp. 2d 1370, 1371, and n. 1 (2003). The parties agree that as a consequence of these judgments and orders, AnimalFeeds and petitioners must arbitrate their antitrust dispute.
B
In 2005, AnimalFeeds served petitioners with a demand for class arbitration, designating New York City as the place of arbitration and seeking to represent a class of “[a]ll direct purchasers of parcel tanker transportation services globally for bulk liquid chemicals, edible oils, acids, and other specialty liquids from [petitioners] at any time during the period from August 1, 1998, to November 30, 2002.” 548 F. 3d 85, 87 (CA2 2008) (internal quotation marks omitted). The parties entered into a supplemental agreement providing for the question of class arbitration to be submitted to a panel of three arbitrators who were to “follow and be bound by Rules 3 through 7 of the American Arbitration Association’s Supplementary Rules for Class Arbitrations (as effective Oct. 8, 2003).” App. to Pet. for Cert. 59a. These rules (hereinafter Class Rules) were developed by the American Arbitration Association (AAA) after our decision in Green Tree Financial Corp. v. Bazzle, 539 U. S. 444 (2003), and Class Rule 3, in accordance with the plurality opinion in that case, requires an arbitrator, as a threshold matter, to determine “whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class.” App. 56a.
The parties selected a panel of arbitrators and stipulated that the arbitration clause was “silent” with respect to class arbitration. Counsel for AnimalFeeds explained to the arbitration panel that the term “silent” did not simply mean that *669 the clause made no express reference to class arbitration. Rather, he said, “[a]ll the parties agree that when a contract is silent on an issue there’s been no agreement that has been reached on that issue.” Id., at 77a.
After hearing argument and evidence, including testimony from petitioners’ experts regarding arbitration customs and usage in the maritime trade, the arbitrators concluded that the arbitration clause allowed for class arbitration. They found persuasive the fact that other arbitrators ruling after Bazzle had construed “a wide variety of clauses in a wide variety of settings as allowing for class arbitration,” but the panel acknowledged that none of these decisions was “exactly comparable” to the present dispute. See App. to Pet. for Cert. 49a-50a. Petitioners’ expert evidence did not show an “inten[t] to preclude class arbitration,” the arbitrators reasoned, and petitioners’ argument would leave “no basis for a class action absent express agreement among all parties and the putative class members.” Id., at 51a.
The arbitrators stayed the proceeding to allow the parties to seek judicial review, and petitioners filed an application to vacate the arbitrators’ award in the District Court for the Southern District of New York. See 9 U. S. C. § 10(a)(4) (authorizing a district court to “make an order vacating the award upon the application of any party to the arbitration . . . where the arbitrators exceeded their powers”); Petition To Vacate Arbitration Award, No. 1:06-CV-00420-JSR (SDNY), App. in No. 06-3474-cv (CA2), p. A-17, ¶ 16 (citing § 10(a)(4) as a ground for vacatur of the award); see also id., at A-15 to A-16, ¶ 9 (invoking the District Court’s jurisdiction under 9 U. S. C. §203 and 28 U. S. C. §§1331 and 1333). The District Court vacated the award, concluding that the arbitrators’ decision was made in “manifest disregard” of the law insofar as the arbitrators failed to conduct a choice-of-law analysis. 435 F. Supp. 2d 382, 384-385 (SDNY 2006). See Wilko v. Swan, 346 U. S. 427, 436-437 (1953) (“[T]he interpretations of the law by the arbitra *670 tors in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation”); see also Petition To Vacate Arbitration Award, supra, at A-17, ¶ 17 (alleging that the arbitration panel “manifestly disregarded the law”). Had such an analysis been conducted, the District Court held, the arbitrators would have applied the rule of federal maritime law requiring that contracts be interpreted in light of custom and usage. 435 F. Supp. 2d, at 385-386.
AnimalFeeds appealed to the Court of Appeals, which reversed. See 9 U. S. C. § 16(a)(1)(E) (“An appeal may be taken from ... an order . . . vacating an award”). As an initial matter, the Court of Appeals held that the “manifest disregard” standard survived our decision in Hall Street Associates, L. L. C. v. Mattel, Inc., 552 U. S. 576 (2008), as a “judicial gloss” on the enumerated grounds for vacatur of arbitration awards under 9 U. S. C. § 10. 548 F. 3d, at 94. Nonetheless, the Court of Appeals concluded that, because petitioners had cited no authority applying a federal maritime rule of custom and usage against class arbitration, the arbitrators’ decision was not in manifest disregard of federal maritime law. Id., at 97-98. Nor had the arbitrators manifestly disregarded New York law, the Court of Appeals continued, since nothing in New York case law established a rule against class arbitration. Id., at 98-99.
We granted certiorari. 557 U. S. 903 (2009).[2]
*671 II
A
Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error — or even a serious error. See Eastern Associated Coal Corp. v. Mine Workers, 531 U. S. 57, 62 (2000); Paperworkers v. Misco, Inc., 484 U. S. 29, 38 (1987). “It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively ‘dispenséis] his own brand of industrial justice’ that his decision may be unenforceable. ” Major League Baseball Players Assn. v. Garvey, 532 U. S. 504, 509 (2001) (per curiam) (quoting Steelworkers v. Enterprise Wheel & Car *672 Corp., 363 U. S. 593, 597 (1960)). In that situation, an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator “exceeded [his] powers,” for the task of an arbitrator is to interpret and enforce a contract, not to make public policy. In this ease, we must conclude that what the arbitration panel did was simply to impose its own view of sound policy regarding class arbitration.[3]
B
1
In its memorandum of law filed in the arbitration proceedings, AnimalFeeds made three arguments in support of construing the arbitration clause to permit class arbitration:
“The parties’ arbitration clause should be construed to allow class arbitration because (a) the clause is silent on the issue of class treatment and, without express prohibition, class arbitration is permitted under Bazzle; (b) the clause should be construed to permit class arbitration as a matter of public policy; and (c) the clause would be unconscionable and unenforceable if it forbade class arbitration.” App. in No. 06-3474-cv (CA2), at A-308 to A-309 (emphasis added).
The arbitrators expressly rejected AnimalFeeds’ first argument, see App. to Pet. for Cert. 49a, and said nothing about the third. Instead, the panel appears to have rested *673 its decision on AnimalFeeds’ public policy argument. Because the parties agreed their agreement was “silent” in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators’ proper task was to identify the rule of law that governs in that situation. Had they engaged in that undertaking, they presumably would have looked either to the FAA itself or to one of the two bodies of law that the parties claimed were governing, i. e., either federal maritime law or New York law. But the panel did not consider whether the FAA provides the rule of decision in such a situation; nor did the panel attempt to determine what rule would govern under either maritime or New York law in the ease of a “silent” contract. Instead, the panel based its decision on post -Bazzle arbitral decisions that “construed a wide variety of clauses in a wide variety of settings as allowing for class arbitration.” App. to Pet. for Cert. 49a-50a. The panel did not mention whether any of these decisions were based on a rule derived from the FAA or on maritime or New York law.[4]
Rather than inquiring whether the FAA, maritime law, or New York law contains a “default rule” under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel proceeded as if it *674 had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation. Perceiving a post-Bazzle consensus among arbitrators that class arbitration is beneficial in “a wide variety of settings,” the panel considered only whether there was any good reason not to follow that consensus in this case. App. to Pet. for Cert. 49a-50a. The panel was not persuaded by “court cases denying consolidation of arbitrations,”[5] by undisputed evidence that the Vegoilvoy charter party had “never been the basis of a class action,” or by expert opinion that “sophisticated, multinational commercial parties of the type that are sought to be included in the class would never intend that the arbitration clauses would permit a class arbitration.”[6] *675 Id., at 50a-51a. Accordingly, finding no convincing ground for departing from the post-Bazzle arbitral consensus, the panel held that class, arbitration was permitted in this ease. App. to Pet. for Cert. 52a. The conclusion is inescapable that the panel simply imposed its own conception of sound policy.[7]
*676 2
It is true that the panel opinion makes a few references to intent, but none of these shows that the panel did anything other than impose its own policy preference. The opinion states that, under Bazzle, “arbitrators must look to the language of the parties’ agreement to ascertain the parties’ intention whether they intended to permit or to preclude class action,” and the panel added that “[tjhis is also consistent with New York law.” App. to Pet. for Cert. 49a. But the panel had no occasion to “ascertain the parties’ intention” in the present case because the parties were in complete agreement regarding their intent. In the very next sentence after the one quoted above, the panel acknowledged that the parties in this case agreed that the Yegoilvoy charter party was “silent on whether [it] permitted] or preelude[d] class arbitration,” but that the charter party was “not ambiguous so as to call for parol evidence.” Ibid. This stipulation left no room for an inquiry regarding the parties’ intent, and any inquiry into that settled question would have been outside the panel’s assigned task.
The panel also commented on the breadth of the language in the Vegoilvoy charter party, see id., at 50a, but since the only task that was left for the panel, in light of the parties’ stipulation, was to identify the governing rule applicable in a case in which neither the language of the contract nor any other evidence established that the parties had reached any agreement on the question of class arbitration, the particular wording of the charter party was quite beside the point.
In sum, instead of identifying and applying a rule of decision derived from the FAA or either maritime or New York *677 law, the arbitration panel imposed its own policy choice and thus exceeded its powers. As a result, under § 10(b) of the FAA, we must either “direct a rehearing by the arbitrators” or decide the question that was originally referred to the panel. Because we conclude that there can be only one possible outcome on the facts before us, we see no need to direct a rehearing by the arbitrators.
III
A
The arbitration panel thought that Bazzle “controlled” the “resolution” of the question whether the Vegoilvoy charter party “permitís] this arbitration to proceed on behalf of a class,” App. to Pet. for Cert. 48a-49a, but that understanding was incorrect.
Bazzle concerned contracts between a commercial lender (Green Tree) and its customers. These contracts contained an arbitration clause but did not expressly mention class arbitration. Nevertheless, an arbitrator conducted class arbitration proceedings and entered awards for the customers.
The South Carolina Supreme Court affirmed the awards. Bazzle v. Green Tree Financial Corp., 351 S. C. 244, 569 S. E. 2d 349 (2002). After discussing both Seventh Circuit precedent holding that a court lacks authority to order classwide arbitration under § 4 of the FAA, see Champ v. Siegel Trading Co., 55 F. 3d 269 (1995), and conflicting California precedent, see Keating v. Superior Court of Alameda Cty., 31 Cal. 3d 584, 645 P. 2d 1192 (1982), the State Supreme Court elected to follow the California approach, which it characterized as permitting a trial eourt to “order class-wide arbitration under adhesive but enforceable franchise contracts,” 351 S. C., at 259, 266, 569 S. E. 2d, at 357, 360. Under this approach, the South Carolina court observed, a trial judge must “[b]alanc[e] the potential inequities and inefficiencies” *678 of requiring each aggrieved party to proceed on an individual basis against “resulting prejudice to the drafting party” and should take into account factors such as “efficiency” and “equity.” Id., at 260, and n. 15, 569 S. E. 2d, at 357, and n. 15.
Applying these standards to the case before it, the South Carolina Supreme Court found that the arbitration clause in the Green Tree contracts was “silent regarding class-wide arbitration.” Id., at 263, 569 S. E. 2d, at 359 (emphasis deleted). The court described its holding as follows:
“[W]e . . . hold that class-wide arbitration may be ordered when the arbitration agreement is silent if it would serve efficiency and equity, and would not result in prejudice. If we enforced a mandatory, adhesive arbitration clause, but prohibited class actions in arbitration where the agreement is silent, the drafting party could effectively prevent class actions against it without having to say it was doing so in the agreement.” Id., at 266, 569 S. E. 2d, at 360 (footnote omitted).
When Bazzle reached this Court, no single rationale commanded a majority. The opinions of the Justices who joined the judgment — that is, the plurality opinion and Justice Stevens’ opinion — collectively addressed three separate questions. The first was which decisionmaker (court or arbitrator) should decide whether the contracts in question were “silent” on the issue of class arbitration. The second was what standard the appropriate decisionmaker should apply in determining whether a contract allows class arbitration. (For example, does the FAA entirely preclude class arbitration? Does the FAA permit class arbitration only under limited circumstances, such as when the contract expressly so provides? Or is this question left entirely to state law?) The final question was whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand.
*679 The plurality opinion decided only the first question, concluding that the arbitrator and not a court should decide whether the contracts were indeed “silent” on the issue of class arbitration. The plurality noted that, “[i]n certain limited circumstances,” involving “gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy,” it is assumed “that the parties intended courts, not arbitrators,” to make the decision. 539 U. S., at 452. But the plurality opined that the question whether a contract with an arbitration clause forbids class arbitration “does not fall into this narrow exception.” Ibid. The plurality therefore concluded that the decision of the State Supreme Court should be vacated and that the case should be remanded for a decision by the arbitrator on the question whether the contracts were indeed “silent.” The plurality did not decide either the second or the third question noted above.
Justice Stevens concurred in the judgment vacating and remanding because otherwise there would have been “no controlling judgment of the Court,” but he did not endorse the plurality’s rationale. Id., at 455 (opinion concurring in judgment and dissenting in part). He did not take a definitive position on the first question, stating only that “[ajrguably the interpretation of the parties’ agreement should have been made in the first instance by the arbitrator.” Ibid. (emphasis added). But because he did not believe that Green Tree had raised the question of the appropriate decisionmaker, he preferred not to reach that question and, instead, would have affirmed the decision of the State Supreme Court on the ground that “the decision to conduct a class-action arbitration was correct as a matter of law.” Ibid. Accordingly, his analysis bypassed the first question noted above and rested instead on his resolution of the second and third questions. Thus, Bazzle did not yield a majority decision on any of the three questions.
*680 B
Unfortunately, the opinions in Bazzle appear to have baffled the parties in this case at the time of the arbitration proceeding. For one thing, the parties appear to have believed that the judgment in Bazzle requires an arbitrator, not a court, to decide whether a contract permits class arbitration. See App. 89a (transcript of argument before arbitration panel) (counsel for Stolt-Nielsen states: ‘What [Bazzle] says is that the contract interpretation issue is left up to the arbitrator, that’s the rule in [Bazzle]”). In fact, however, only the plurality decided that question. But we need not revisit that question here because the parties’ supplemental agreement expressly assigned this issue to the arbitration panel, and no party argues that this assignment was impermissible.
Unfortunately, however, both the parties and the arbitration panel seem to have misunderstood Bazzle in another respect, namely, that it established the standard to be applied by a decisionmaker in determining whether a contract may permissibly be interpreted to allow class arbitration. The arbitration panel began its discussion by stating that the parties “differ regarding the rule of interpretation to be gleaned from [the Bazzle] decision.” App. to Pet. for Cert. 49a (emphasis added). The panel continued:
“Claimants argue that Bazzle requires clear language that forbids class arbitration in order to bar a class action. The Panel, however, agrees with Respondents that the test is a more general one — arbitrators must look to the language of the parties’ agreement to ascertain the parties’ intention whether they intended to permit or to preclude class action.” Ibid.
As we have explained, however, Bazzle did not establish the rule to be applied in deciding whether class arbitration is *681 permitted.[8] The decision in Bazzle left that question open, and we turn to it now.
IV
While the interpretation of an arbitration agreement is generally a matter of state law, see Arthur Andersen LLP v. Carlisle, 556 U. S. 624, 630-631 (2009); Perry v. Thomas, 482 U. S. 483, 493, n. 9 (1987), the FA A imposes certain rules of fundamental importance, including the basic precept that arbitration “is a matter of consent, not coercion,” Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U. S. 468, 479 (1989).
A
In 1925, Congress enacted the United States Arbitration Act, as the FAA was formerly known, for the express pur *682 pose of making “valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations.” 43 Stat. 883. Reenacted and codified in 1947, see 61 Stat. 669,[9] the FAA provides, in pertinent part, that a “written provision in any maritime transaction” calling for the arbitration of a controversy arising out of such transaction “shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract,” 9 U. S. C. §2. Under the FAA, a party to an arbitration agreement may petition a United States district court for an order directing that “arbitration proceed in the manner provided for in such agreement.” §4. Consistent with these provisions, we have said on numerous occasions that the central or “primary” purpose of the FAA is to ensure that “private agreements to arbitrate are enforced according to their terms.” Volt, supra, at 479; Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U. S. 52, 57, 58 (1995); see also Doctor’s Associates, Inc. v. Casarotto, 517 U. S. 681, 688 (1996). See generally 9 U. S. C. §4.
Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must “give effect to the contractual rights and expectations of the parties.” Volt, supra, at 479. In this endeavor, “as with any other contract, the parties’ intentions control.” Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 626 (1985). This is because an arbitrator derives his or her powers from the parties’ agreement to forgo the legal process and submit their disputes to private dispute resolution. See AT&T Technologies, Inc. v. Communications Workers, 475 U. S. 643, 648-649 (1986) (“[A]rbitrators derive *683 their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration”); Mitsubishi Motors, supra, at 628 (“By agreeing to arbitrate . . . , [a party] trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration”); see also Steelworkers v. Warrior & Gulf Nav. Co., 363 U. S. 574, 581 (1960) (an arbitrator “has no general charter to administer justice for a community which transcends the parties” but rather is “part of a system of self-government created by and confined to the parties” (internal quotation marks omitted)).
Underscoring the consensual nature of private dispute resolution, we have held that parties are “‘generally free to structure their arbitration agreements as they see fit.’” Mastrobuono, supra, at 57; see also AT&T Technologies, supra, at 648-649. For example, we have held that parties may agree to limit the issues they choose to arbitrate, see Mitsubishi Motors, supra, at 628, and may agree on rules under which any arbitration will proceed, Volt, supra, at 479. They may choose who will resolve specific disputes. E. g., App. 30a; Alexander v. Gardner-Denver Co., 415 U. S. 36, 57 (1974); Burchell v. Marsh, 17 How. 344, 349 (1855); see also International Produce, Inc. v. A/S Rosshavet, 638 F. 2d 548, 552 (CA2) (“The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose”), cert. denied, 451 U. S. 1017 (1981).
We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify with wkom they choose to arbitrate their disputes. See EEOC v. Waffle House, Inc., 534 U. S. 279, 289 (2002) (“[Njothing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement” (emphasis added)); Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U. S. 1, 20 (1983) (“[A]n arbitration agreement must be enforced notwithstand *684 ing the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement”); Steelworkers, supra, at 581 (an arbitrator “has no general charter to administer justice for a community which transcends the parties” (internal quotation marks omitted)); accord, First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 943 (1995) (“[Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration” (emphasis added)). It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties. Volt, 489 U. S., at 479.
B
From these principles, it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so. In this case, however, the arbitration panel imposed class arbitration even though the parties concurred that they had reached “no agreement” on that issue, see App. 77a. The critical point, in the view of the arbitration panel, was that petitioners did not “establish that the parties to the charter agreements intended to preclude class arbitration.” App. to Pet. for Cert. 51a. Even though the parties are sophisticated business entities, even though there is no tradition of class arbitration under maritime law, and even though AnimalFeeds does not dispute that it is customary for the shipper to choose the charter party that is used for a particular shipment, the panel regarded the agreement’s silence on the question of class arbitration as dispositive. The panel’s conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent.
In certain contexts, it is appropriate to presume that parties that enter into an arbitration agreement implicitly au *685 thorize the arbitrator to adopt such procedures as are necessary to give effect to the parties’ agreement. Thus, we have said that “' “procedural” questions which grow out of the dispute and bear on its final disposition’ are presumptively not for the judge, but for an arbitrator, to decide.” Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79, 84 (2002) (quoting John Wiley & Sons, Inc. v. Livingston, 376 U. S. 543, 557 (1964)). This recognition is grounded in the background principle that “[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.” Restatement (Second) of Contracts §204 (1979).
An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties’ agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. See Gilmer v. Interstate/Johnson Lane Corp., 500 U. S. 20, 31 (1991); Mitsubishi Motors, 473 U. S., at 628; see also 14 Penn Plaza LLC v. Pyett, 556 U. S. 247, 257 (2009) (“Parties generally favor arbitration precisely because of the economics of dispute resolution” (citing Circuit City Stores, Inc. v. Adams, 532 U. S. 105, 123 (2001))); Gardner-Denver, supra, at 57 (“Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations”). But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties’ mutual consent to resolve *686 disputes through classwide arbitration. Cf. First Options, supra, at 945 (noting that “one can understand why courts might hesitate to interpret silence or ambiguity on the ‘who should decide arbitrability point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate” contrary to their expectations).
Consider just some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure, see, e. g., supra, at 667, no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties. See App. 86a (“[W]e believe domestic class members could be in the hundreds” and that “[t]here could be class members that ship to and from the U. S. who are not domestic who we think would be covered”); see also, e. g., Bazzle, 351 S. C., at 251, 569 S. E. 2d, at 352-353 (involving a class of 1,899 individuals that was awarded damages, fees, and costs of more than $14 million by a single arbitrator). Under the Class Rules, “[t]he presumption of privacy and confidentiality” that applies in many bilateral arbitrations “shall not apply in class arbitrations,” see Addendum to Brief for AAA as Amicus Curiae 10a (Class Rule 9(a)), thus potentially frustrating the parties' assumptions when they agreed to arbitrate. The arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well. Cf. Ortiz v. Fibreboard Corp., 527 U. S. 815, 846 (1999) (noting that “the burden of justification rests on the exception” to the general rule that “one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process” (internal quotation marks omitted)). And the commercial stakes of class-action arbitration are comparable to those of class-action litigation, cf. App. in No. 06-3474-cv (CA2), at A-77, A-79, ¶¶30, 31, 40, even *687 though the scope of judicial review is much more limited, see Hall Street, 552 U. S., at 588. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties’ mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings.[10]
The dissent minimizes these crucial differences by characterizing the question before the arbitrators as being merely what “procedural mode” was available to present Animal-Feeds’ claims. Post, at 696. If the question were that simple, there would be no need to consider the parties’ intent with respect to class arbitration. See Howsam, supra, at 84 (committing “procedural questions” presumptively to the arbitrator’s discretion (internal quotation marks omitted)). But the FAA requires more. Contrary to the dissent, but consistent with our precedents emphasizing the consensual basis of arbitration, we see the question as being whether the parties agreed to authorize class arbitration. Here, where the parties stipulated that there was “no agreement” on this question, it follows that the parties cannot be compelled to submit their dispute to class arbitration.
V
For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice Sotomayor took no part in the consideration or decision of this case.

"[C]harter parties are commonly drafted using highly standardized forms specific to the particular trades and business needs of the parties.” Comment, A Comparative Analysis of Charter Party Agreements “Subject to” Respective American and British Laws and Decisions ... It’s AH in the Details, 26 Tulane Mar. L. J. 291, 294 (2001-2002); see also 2 T. Schoenbaum, Admiralty and Maritime Law § 11-1, p. 200 (3d ed. 2001).

 Invoking an argument not pressed in or considered by the courts below, the dissent concludes that the question presented is not ripe for our review. See post, at 688, 689-692 (opinion of Ginsburg, J.). In so doing, the dissent offers no clear justification for now embracing an argument “we necessarily considered and rejected” in granting certiorari. United States v. Williams, 504 U. S. 36, 40 (1992). Ripeness reflects constitutional considerations that implicate “Article III limitations on judicial power,” as well as “prudential reasons for refusing to exercise jurisdiction.” Reno v. Catholic Social Services, Inc., 509 U. S. 43, 57, n. 18 (1993). In evaluating a claim to determine whether it is ripe for judicial review, we consider both “the fitness of the issues for judicial decision” and “the *671 hardship to the parties of withholding court consideration.” National Park Hospitality Assn. v. Department of Interior, 538 U. S. 803, 808 (2003). To the extent the dissent believes that the question on which we granted certiorari is constitutionally unripe for review, we disagree. The arbitration panel’s award means that petitioners must now submit to class determination proceedings before arbitrators who, if petitioners are correct, have no authority to require class arbitration absent the parties’ agreement to resolve their disputes on that basis. See Class Rule 4(a) (dted in App. 57a); Brief for AAA as Amicus Curiae 17. Should petitioners refuse to proceed with what they maintain is essentially an ultra vires proceeding, they would almost certainly be subject to a petition to compel arbitration under 9 U. S. C. §4. Cf. Regional Rail Reorganization Act Cases, 419 U. S. 102,143 (1974) (“Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect”). We think it is clear on these facts that petitioners have demonstrated suffident hardship, and that their question is fit for our review at this time. To the extent the dissent believes that the question is prudentially unripe, we reject that argument as waived, Sprietsma v. Mercury Marine, 537 U. S. 51, 56, n. 4 (2002), and we see no reason to disregard the waiver. We express no view as to whether, in a similar case, a federal court may consider a question of prudential ripeness on its own motion. See National Park Hospitality Assn., supra, at 808 (“[E]ven in a case raising only prudential concerns, the question of ripeness may be considered on a court’s own motion”).

 We do not decide whether ‘“manifest disregard’” survives our decision in Hall Street Associates, L. L. C. v. Mattel, Inc., 552 U. S. 576, 585 (2008), as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U. S. C. § 10. AnimalFeeds characterizes that standard as requiring a showing that the arbitrators “knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.” Brief for Respondent 25 (internal quotation marks omitted). Assuming, arguendo, that such a standard applies, we find it satisfied for the reasons that follow.

 The panel’s reliance on these arbitral awards confirms that the panel’s decision was not based on a determination regarding the parties’ intent. All of the arbitral awards were made under the AAA’s Class Rules, which were adopted in 2003, and thus none was available when the parties here entered into the Vegoilvoy charter party during the class period ranging from 1998 to 2002. See 548 F. 3d 85, 87 (CA2 2008) (defining the class period). Indeed, at the hearing before the panel, counsel for AnimalFeeds conceded that “[w]hen you talk about expectations, virtually every one of the arbitration clauses that were the subject of the 25 AAA decisions were drafted before [Bazzle]. So therefore, if you are going to talk about the parties’ intentions, yre-[Bazzle] class arbitrations were not common, post [Bazzle] they are common.” App. 87a. Moreover, in its award, the panel appeared to acknowledge that none of the cited arbitration awards involved a contract between sophisticated business entities. See App. to Pet. for Cert. 50a.

 See Government of United Kingdom v. Boeing Co., 998 F. 2d 68, 71, 74 (CA2 1993); see also Glencore, Ltd. v. Scknitzer Steel Prods. Co., 189 F. 3d 264, 268 (CA2 1999); Champ v. Siegel Trading Co., 55 F. 3d 269, 275 (CA7 1995). Unlike the subsequent arbitration awards that the arbitrators cited, these decisions were available to the parties when they entered into their contracts.

 Petitioners produced expert evidence from experienced maritime arbitrators demonstrating that it is customary in the shipping business for parties to resolve their disputes through bilateral arbitration. See, e. g., App. 126a (expert declaration of John Kimball) (“In the 30 years I have been practicing as a maritime lawyer, I have never encountered an arbitration clause in a charter party that could be construed as allowing class action arbitration”); id., at 139a (expert declaration of Bruce Harris) (“I have been working as a maritime arbitrator for thirty years and this matter is the first I have ever encountered where the issue of a class action arbitration has even been raised”). These experts amplified their written statements in their live testimony, as well. See, e. g., id., at 112a, 113a (Mr. Kimball) (opining that the prospect of a class action in a maritime arbitration would be “quite foreign” to overseas shipping executives and charterers); id., at llla-112a (Mr. Harris) (opining that in the view of the London Corps of International Arbitration, class arbitration is “inconceivable”).
Under both New York law and general maritime law, evidence of “custom and usage” is relevant to determining the parties’ intent when an express agreement is ambiguous. See Excess Ins. Co. v. Factory Mut. Ins. Co., 3 N. Y. 3d 577, 590-591, 822 N. E. 2d 768, 777 (2004) (“Our prece *675 dent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration”); Lopez v. Consolidated Edison Co. of N. Y., 40 N. Y. 2d 605, 609, 357 N. E. 2d 951, 954-955 (1976) (where contract terms were ambiguous, parol evidence of custom and practice was properly admitted to show parties’ intent); 407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp., 23 N. Y. 2d 275, 281, 244 N. E. 2d 37, 41 (1968) (contract was “not so free from ambiguity to preclude extrinsic evidence” of industry “custom and usage” that would “establish the correct interpretation or understanding of the agreement as to its term”). See also Great Circle Lines, Ltd. v. Matheson & Co., 681 F. 2d 121, 125 (CA2 1982) (“Certain long-standing customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract”); Samsun Corp. v. Khozestan Mashine Kar Co., 926 F. Supp. 436, 439 (SDNY 1996) (“[W]here as here the contract is one of charter party, established practices and customs of the shipping industry inform the court’s analysis of what the parties agreed to”); Hough, Admiralty Jurisdiction — Of Late Years, 37 Harv. L. Rev. 529, 536 (1924) (noting that “maritime law is a body of sea customs” and the “custom of the sea . . . ineludes a eustomary interpretation of contract language”).

 The dissent ealls this conclusion “hardly fair,” noting that the word “'policy’ is not so much as mentioned in the arbitrators’ award.” Post, at 694. But just as merely saying something is so does not make it so, cf. United States v. Morrison, 529 U. S. 598, 614 (2000), the arbitrators need not have said they were relying on policy to make it so. At the hearing before the arbitration panel, one of the arbitrators recognized that the body of post-Bazzle arbitration awards on which AnimalFeeds relied involved “essentially consumer non-value eases.” App. 82a. In response, counsel for AnimalFeeds defended the applicability of those awards by asserting that the “vast majority” of the claimants against petitioners “have negative value claims ... meaning it costs more to litigate than you would get if you won.” Id., at 82a-83a. The panel credited this body of awards in concluding that petitioners had not demonstrated the parties’ *676 intent to preclude class arbitration, and further observed that if petitioners’ anticonsolidation precedents controlled, then “there would appear to be no basis for a class action absent express agreement among all parties and the putative class members.” App. to Pet. for Cert. 50a, 51a.

 AnimalFeeds invokes the parties’ supplemental agreement as evidence that petitioners “waived” any claim that the arbitrators could not construe the arbitration agreement to permit class arbitration. Brief for Respondent 15. The dissent concludes, likewise, that the existence of the parties’ supplemental agreement renders petitioners’ argument under § 10(a)(4) “scarcely debatable.” Post, at 694. These arguments are easily answered by the dear terms of the supplemental agreement itself. The parties expressly provided that their supplemental agreement “does not alter the scope of the Parties’ arbitration agreements in any Charter Party Agreement,” and that “[njeither the fact of this Agreement nor any of its terms may be used to support or oppose any argument in favor of a class action arbitration . . . and may not be relied upon by the Parties, any arbitration panel, any tourt, or any other tribunal for such purposes.” App. to Pet. for Cert. 62a-63a (emphasis added). As with any agreement to arbitrate, we are obliged to enforce the parties’ supplemental agreement “according to its terms.” Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U. S. 52, 58 (1995). The question that the arbitration panel was charged with dedding was whether the arbitration dause in the Vegoilvoy charter party allowed for dass arbitration, and nothing in the supplemental agreement conferred authority on the arbitrators to exceed the terms of the charter party itself. Thus, contrary to AnimalFeeds’ argument, these statements show that petitioners did not waive their argument that Bazzle did not establish the standard for the decisionmaker to apply when construing an arbitration clause.

 See generally Sturges & Murphy, Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act, 11 Law & Contemp. Prob. 580, 580-581, n. 1 (1952) (recounting the history of the United States Arbitration Act and its 1947 reenactment and codification).

 We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was “no agreement” on the issue of class-action arbitration. App. 77a.