STRANCH, Circuit Judge,
dissenting.
DISSENT
I agree that the Supreme Court’s decision in M & G Polymers USA, LLC v. Tackett, — U.S.—, 135 S.Ct. 926, 190 *275 L.Ed.2d 809 (2015), governs this case and have no quarrel with much of the majority’s articulation of its holding. I do not dispute that the Supreme Court rejected certain “inferences” applied by our court in UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), and its progeny, finding them to be “inconsistent with ordinary principles of contract law.” Tackett, 135 S.Ct. at 937. The majority also correctly recognizes that Tackett does not create a clear-statement rule in favor of employers: employees are not required to “satisfy the rigors of clarity” to vest retiree healthcare benefits. (Maj. Op. at 274.) Instead, as this court clarified on remand, the Supreme Court “declined to adopt an ‘explicit language’ requirement in favor of companies” and instead'instructed that courts are to interpret collective bargaining agreements in accordance with ordinary contract principles — without placing a thumb on the scale for either employers or employees. Tackett v. M & G Polymers USA LLC, No. 123329, 811 F.3d 204, 208-10, 2016 WL 240414, at *4-5 (6th Cir. Jan. 21, 2016) (published).[1] It is here that my disagreement arises. I think that the majority transgressed this admonition by placing a thumb on the employer’s scale.
The question presented is whether Moen Incorporated’s Retirees (a designation that includes their spouses and eligible dependents) are correct in their claim that the collective bargaining agreements and plant closing agreement grant vested, lifetime healthcare benefits to Retirees. The majority determines that ordinary contract principles compel the conclusion that the agreements unambiguously do not grant lifetime healthcare benefits and then declines to address the bulk of the extrinsic evidence presented by Retirees. I disagree with both determinations. I conclude that the language of the agreements — when properly viewed in their entirety — is ambiguous and that the extrinsic evidence resolves the ambiguity in favor of Retirees. I therefore respectfully dissent.
I. Applying Ordinary Principles of Contract Law
In interpreting a collective bargaining agreement, as with any other contract, “the parties’ intentions control.” Tackett, 135 S.Ct. at 933 (quoting Stolt-Nielsen S.A. v. AnimalFeeds Int’l Corp., 559 U.S. 662, 682, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010)). “Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.” Id. (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Willi-ston)). At this stage, courts “may look to known customs or usages in a particular industry to determine the meaning of a contract,” as long as the custom or usage is supported by affirmative evidence in the particular case. Id. at 935 (citing 12 Willi-ston § 34:3). Where the parties’ intentions remain ambiguous after review of the language of the agreement, extrinsic evidence may be used to resolve that ambiguity. Id. at 937-38 (Ginsburg, J., concurring) (citing 11 Williston § 30:7, p. 116— 124); see also Brooklyn Life Ins. Co. of N.Y. v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. *276 410 (1877) (“There is no surer way to find out what parties meant, than to see what they have done.”).
Because courts consider both industry customs or usages and extrinsic evidence to determine the meaning of a contract, context matters. See Tackett, 135 S.Ct. at 935. As the Supreme Court acknowledged in Tackett, the context here — interpretation of collective bargaining agreements negotiated between representatives of the company and its employees/retirees in the manufacturing industry — calls for application of “ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy.” Id. at 933 (citing Textile Workers v. Lincoln Mills, of Ala., 353 U.S. 448, 456-57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)). Federal labor policy has long recognized the unique character of collective bargaining relationships: “[t]he collective agreement covers the whole employment relationship. It calls into being a new common law-the common law of a particular industry or of a particular plant,” which “implements and furnishes the context of the agreement.” United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579-80, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Accordingly, context is particularly important here.
Recognizing the importance of context, Retirees urge this court to consider the background understandings of the parties. Tackett III acknowledged that the Supreme Court “did not purport to discuss all of the ordinary principles of contract law” and identified other ordinary contract principles showing that courts may consider background understandings. See Tackett III, 811 F.3d at 208, 2016 WL 240414, at *4 (identifying additional “ordinary principles of contract law” from Justice Ginsburg’s concurrence (including that courts may consider the parties’ “bargaining history”) and from the parties’ arguments referencing 11 Williston § 30:19 (stating that courts may consider “that contracts incorporate existing law”)). Discounting this context, however, the majority concludes that the legal distinction between benefit packages that are the subject of collective bargaining and those that are not is a “strangely inverted regime” that favors employees who have “the benefit of union representation.” (Maj. Op. at 273 (citing Rossetto v. Pabst Brewing Co., 217 F.3d 539, 543-44 (7th Cir.2000)).)[2] In other words, the majority suggests that collective bargaining agreements should be interpreted without consideration of the background understandings that are unique to collective bargaining. Of course all employees share a legitimate concern about their benefit packages, but, as recognized by federal labor policy, a collective bargaining system entails practical distinctions from other contracting situations.
The majority’s refusal to acknowledge distinctions regarding the nature of collective bargaining causes it to mischaracterize Retirees’ argument that courts should consider the background understandings of the parties as nothing more than a *277 request to adopt a “new inference about prior assumptions.” (Maj. Op. at 272.) Based on its mischaracterization, the majority then attacks Retirees’ argument by positing a list of “ever-uncertain assumptions about the future” for which courts should not account. (Id. at 272) That discussion is simply inapposite (though it should be acknowledged that uncertainties don’t just strike those fearing the cost to provide healthcare coverage — there are plenty of uncertainties for Retirees fearing the loss of their family’s healthcare coverage).
Retirees’ argument is not about whether today we can posit uncertainties — it merely proposes a proper examination of “the entire agreement in light of relevant industry-specific ‘customs, practices, usages, and terminology’ ” and other ordinary principles of contract law. Tackett, 135 S.Ct. at 937-38 (Ginsburg, J., concurring). The argument requests an examination directed to the context when the parties entered the CBA. For example, one context wholly missed by the majority is the reality that collective bargaining negotiations for employee contractual pay and benefit packages routinely entail a primarily fixed amount of money to be divided between pay and benefits. In collective bargaining, negotiating additional contributions into benefits means less pay in an employee’s pocket, which is a dynamic different from non-represented industries. Thus, in applying ordinary contract principles, it is appropriate to recognize the industrial reality of the give and take of a negotiated union contract when gathering the intention of the parties from the whole instrument.
A. Language of the Agreements
The majority serially examines and rejects each contract argument of Retirees as insufficient to show either a contractual commitment to provide lifetime healthcare benefits or an ambiguity in the contract documents that would allow for examination of extrinsic evidence. But this divide and conquer analysis transgresses the “cardinal principle” of contract interpretation: the intention of the parties to a contract is “to be gathered from the whole instrument.” Id. (quoting 11 Williston § 30:2, p. 27). Characteristics and particulars of the whole instrument — the collective bargaining agreements and the plant closing agreement — must be considered together. I turn now to examination of these agreements.
Retirees argue that the use of future tense language throughout the collective bargaining agreements evidences intent to vest retiree healthcare. The majority opines that, “[i]f Tackett tells us anything,” it is that the future tense language used by the parties, without more, “does not guarantee lifetime benefits.” (Maj. Op. at 271 (citing Tackett, 135 S.Ct. at 937).) But Tackett did not address what may be implied from the use of future tense and expressly chose not to answer the vesting question but to remand it for this court to do so, absent the Yard-Man inferences. See Tackett III, 811 F.3d at 206, 2016 WL 240414, at *1. In Litton Financial Printing Division, a Division of Litton Business Systems, Inc. v. NLRB, moreover, the Supreme Court explained that duties in a contract may arise from its “express or implied terms.” 501 U.S. 190, 203, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). Consistent with the “cardinal principle” of contract interpretation, we must look to both express and implied terms in all the agreements to determine the intention of the parties. See Tackett III, 811 F.3d at 208-09, 2016 WL 240414, at *4 (citing Litton, 501 U.S. at 207, 111 S.Ct. 2215).
The majority dismisses out of hand the standalone argument based on future *278 tense language and instead specifies an additional requirement to point to “words committing to retain the benefit for life”— an addition at odds with Litton. (Maj. Op. at 271.) The future tense language used in the agreements, however, could imply intent that retiree healthcare be vested— especially if other aspects of the “whole instrument” point in that direction. Both are true here. The 2005 collective bargaining agreement, for example, provides that “[cjontinued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and then-dependents”; “future retirees will be covered under the new medical plan”; “[t]he co-premium amount for the retiree will be frozen at the co-premium in effect at the time of retirement”; and “[t]he Company will pay the monthly premium charge ... for all retirees and future retirees ... and their eligible dependents under the terms of the policy.” It is appropriate to consider the- presence of this future tense language in the agreements, along -with their other characteristics and particulars, to ascertain the intention of the parties. The majority’s blanket conclusion otherwise amounts to a clear statement rule in favor of employers, a position that it correctly disavowed as contrary to Tackett. (Maj. Op. at 274.) See Tackett III, 811 F.3d at 208-09, 2016 WL 240414, at *4.
Turning to other evidence of intent to vest that can be gleaned from the “whole instrument,” Retirees cite the link in the agreements between retiree healthcare benefits and pensioner status. The 2005 collective bargaining agreement states that health benefits “will be provided without cost to past pensioners and their dependents” and includes Medicare Part B reimbursements in “pension payments.” The majority presumes this language to refer to eligibility and then concludes that “Tackett rejected this kind of ‘tying’ analysis.” (Maj. Op. at 272.) The Supreme Court did reject as an improper inference the conclusion that “the tying of eligibility for health care benefits to receipt of pension benefits suggested an intent to vest health care benefits.” Tackett, 135 S.Ct. at 937. But the contract language before us does not refer to eligibility. Justice Ginsburg’s concurrence illustrates a proper examination of contractual language that specifies the relationship between healthcare and pension benefits: “[b]e-cause the retirees have a vested, lifetime right to a monthly pension ... a provision stating that retirees “will receive’ healthcare benefits if they are ‘receiving a monthly pension’ is relevant to the examination.” See id. at 938 (Ginsburg, J., concurring). The majority posits the necessity for magic language (“for as long as”) (Maj. Op. at 272), but the agreement at issue in Tackett did not contain that language, the majority did not require that language, and Justice Ginsburg’s example did not include that language. Tracking Justice Ginsburg’s example, the contract language here specifies that Retirees have a vested, lifetime right to a monthly pension and “will receive” healthcare benefits if they are “pensioners.” This is durational tying language that is relevant to our examination of the “whole instrument.”
Retirees also argue that intent to vest is suggested by the agreements’ inclusion of explicit durational limitations for other benefits but not retiree healthcare. For example, the 2005 collective bargaining agreement limits the time in which terminated and laid-off employees may receive healthcare, and the plant closing agreement gives healthcare benefits to employees for certain time periods based on the employee’s length of service. The majority dismisses this argument based on the collective bargaining agreements’ inclusion of general durational clauses. Noting that “we should not expect to find lifetime com *279 mitments in time-limited agreements,” the majority presumes that when a specific provision of a collective bargaining agreement does not include an explicit end date that provision must be governed by the general durational clause of the agreement. (Maj. Op. at 269-70 (citing Tackett, 135 S.Ct. at 936).)
As acknowledged by Tackett III, the majority’s formulation is neither authorized nor compelled by Tackett and improperly places a thumb on the employers’ scale. See Tackett III, 811 F.3d at 208-09, 2016 WL 240414, at *4. The Supreme Court did criticize Yard-Man and its progeny for creating presumptions of vesting “not from record evidence, but instead from its own suppositions about the intentions,” including the presumptions that “a general durational clause says nothing about the vesting of retiree benefits” and that a contract must “include a specific durational clause for retiree health care benefits to prevent vesting.” Tackett, 135 S.Ct. at 935-36 (quoting Noe v. PolyOne Corp., 520 F.3d 548, 555 (6th Cir.2008)). But those criticisms do not authorize the majority’s opposite inferences — that a general durational clause says everything about vesting and that vesting occurs only if the contract includes a “longer time limit” in the “specific provision.” (Maj. Op. at 269.) See Tackett III, 811 F.3d at 209, 2016 WL 240414, at *4 (“[W]e also cannot presume that the absence of such specific language, by itself, evidences an intent not to vest benefits or that a general durational clause says everything about the intent to vest.”). Having noted that “contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement,” the Supreme Court explained that this “principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees.” Tackett, 135 S.Ct. at 937 (citing Litton, 501 U.S. at 207, 111 S.Ct. 2215). Litton teaches that “[ejxceptions [to this ordinary course] are determined by contract interpretation. Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement,” Litton, 501 U.S. at 207, 111 S.Ct. 2215, and “constraints upon the employer” may arise “from the express or implied terms of the expired agreement,” id. at 203, 111 S.Ct. 2215. Thus, we must “consider all relevant contractual language in light of industry practices,” seeking the express or implied intention of the parties. Tackett, 135 S.Ct. at 938 (Ginsburg, J., concurring).
Relevant contract language also includes the 2008 plant closing agreement, which states that the 2005 collective bargaining agreement shall cease to exist, “except for items as agreed to in this agreement,” when “all bargaining unit employees cease working at the facility.” Retiree healthcare is identified as an item that will not cease to exist upon plant closure: “Healthcare, Sub and Pension and related benefits shall continue ... for all retirees and spouses as indicated under the [2005 agreement].” Retirees argue that the only way to make this benefits continuation clause not redundant or superfluous is to interpret it as recognizing the intent to vest retiree healthcare benefits in the collective bargaining agreements and authorizing provision after the plant’s closing. See TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574, 578 (6th Cir.2010) (holding that courts, to deal with ambiguity, should interpret contracts to avoid superfluous words).
The majority rejects Retirees’ argument by concluding that the plant closing agreement simply incorporates the terms of the 2005 collective bargaining agreement and, because that agreement did not provide for vested benefits, “an agreement that incorporates it by reference does not do so *280 either.” (Maj. Op. at 273.) The majority then denies applicability of the rule against superfluous words on the basis that the rule is a “tool[ ] for dealing with ambiguity, not a tool for creating ambiguity in the first place,” and that the plant closing agreement’s clause incorporating the 2005 agreement is unambiguous. (Id. (quoting TMW Enters., Inc., 619 F.3d at 578).)
Again, contract principles dictate that we seek the intention of the parties from the whole of the contract language — here, both the collective bargaining agreements and the plant closing agreement. Interpreting the collective bargaining agreements as not vesting retiree healthcare benefits renders the plant closing agreement’s “shall continue” clause superfluous. If retiree healthcare was not vested by the 2005 collective bargaining agreement, then the benefits would have terminated pursuant to the plant closing agreement’s general provision that the 2005 agreement will cease to exist upon plant closing. There would have been no reason for the parties to reiterate, in the same document, that the benefits “shall continue” for as long as the 2005 agreement permits. It did not do so for any other non-vested provisions. Interpreting the 2005 agreement as vesting retiree healthcare, on the other hand, would give the plant closing agreement’s “shall continue” clause meaning. Specifically, the clause would confirm that retiree healthcare benefits, as vested by the 2005 agreement, are not subject to the plant closing agreements’ general provision that the 2005 agreement will cease to exist upon plant closing. The rule against superfluous words thus resolves ambiguity that could have arisen in the language of the two contracts.
As a final point, the majority construes the collective bargaining agreements’ reservation-of-rights clauses as evidencing an intent not to vest. (Maj. Op. at 270-71.) The answer to that is simple: that provision does not unambiguously apply to Retirees. In each of the collective bargaining agreements, the reservation-of-rights clause is contained in a separate paragraph furnishing insurance for Moen’s “employees,” not their “retirees,” while different contract paragraphs govern retiree health insurance. The term “employee” has meaning: “[t]he ordinary meaning of ‘employee’ does not include retired workers; retired employees have ceased to work for another for hire.” Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div., 404 U.S. 157, 168, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). But even if the reservation of rights clause did apply to Retirees, the other provisions evidencing intent to vest renders the agreements as a whole ambiguous.
Applying ordinary contract principles and the Supreme Court’s instructions in Tackett to all of the relevant contract language viewed in light of industry practices reveals ambiguity within the various contract provisions. Because the parties’ intentions cannot be derived unambiguously from the language of the agreements, I turn to the extrinsic evidence to see whether the ambiguity may be resolved.
B. Extrinsic Evidence
The record contains objective evidence of the parties intent to vest retiree healthcare benefits. That evidence includes statements from Moen representatives to Retirees — made in negotiating sessions, before the pension committee, and in one-on-one conversations' — 'that their benefits were “for life” or “forever” and advising surviving spouses that they were “entitled” to continue medical benefits upon the death of a Retiree. Moen’s Retirement Health Enrollment Forms contain no indication to Retirees that their health benefits could be cancelled or the premiums *281 paid increased. Surviving spouses of Retirees were assured in writing that “as long as” the spouse continues to receive a pension, they “would continue to be covered under the group insurance program,” expressly linking the duration of retiree healthcare to pensioner status. In accordance with this understanding, the parties operated for decades as if the retiree benefits were vested — Moen continued to provide benefits until 2014, years after the plant had closed. See UAW v. Skinner Engine Co., 188 F.3d 130, 144 (3d Cir.1999) (holding that courts may infer from employer continuing to provide retiree benefits after termination of a collective bargaining agreement that retiree benefits were vested by that agreement); Weimer v. Kurz-Kasch, Inc., 773 F.2d 669, 676 n. 6 (6th Cir.1985) (same); Bower v. Bunker Hill, 725 F.2d 1221, 1225 (9th Cir.1984) (same). Moen never reduced retiree benefits, and each Retiree’s benefits mirrored the benefits provided at the time he or she retired.
In addition, the record reveals that many employees, following the plant closing agreement but before plant closure, chose to take a significantly reduced pension and retire early under an active 2005 collective bargaining agreement in order to qualify for retiree healthcare benefits. By choosing to retire early, these employees accepted an actuarial reduction in their pension of “a percentage equal to 1/2 of 1%” for each month prior to their 62nd birthday. One employee, for example, qualified for and took early retirement at age 58 and testified to suffering a 23% reduction in his lifetime monthly pension benefit. The choice to take a significantly reduced pension across their lifetime makes no sense unless these employees were told and believed that, by retiring during the term of the 2005 collective bargaining agreement, they would receive vested retiree healthcare.
The majority responds that the language of the agreements is unambiguous and thus extrinsic evidence must be ignored. It then indirectly addresses the parties’ actions regarding retiree healthcare by doing just what Tackett warned against— assessing intent based on its own suppositions that have no support in the record (and are in fact contradicted by it). See Tackett, 135 S.Ct. at 935 (chastising this court for “deriving] its assessment of likely behavior not from record evidence, but instead from its own suppositions”). For example, the majority opines that “Moen, like many employers, may have wished that business conditions and stable healthcare costs (hope springs eternal) would permit it to provide similar healthcare benefits to retirees throughout retirement.” (Maj. Op. at 269.) In that same vein, the majority assigns favorable motivation to Moen, opining that a company cannot be blamed for hoping “to its credit ... to subsidize healthcare benefits for its retirees for as long as possible.” (Maj. Op. at 274.)
The majority points to no record evidence supporting these assessments of the parties’ intentions. Such conclusions of benevolence are belied by the statements and admissions regarding Moen’s contractual responsibilities. The majority’s assessments, therefore, are speculative and far removed from the context of these particular agreements and the practices of this industry, and thus cannot be used to explain away the extrinsic evidence that reveals an intent to vest retiree healthcare benefits.
II. Conclusion
The majority examines the contractual agreements piece-by-piece while broadening and misapplying the Supreme Court’s decision in Tackett to find that the parties’ *282 unambiguously intended not to vest retiree healthcare. Reviewing the whole of the contractual agreements and the specific contract language evidencing the intentions of the parties leads me to conclude that the CBA and the plant closing agreements are ambiguous on the issue of vested retiree healthcare benefits. The background understandings - of the parties; realities of the relationship between the parties; customs, practices, and usages in the industry; context of negotiations; and law and policy also lead to that conclusion. The extrinsic evidence, including the statements and actions of the parties, resolves that ambiguity in favor of Retirees. Thus, under the standard set out in Tackett, the district court’s grant of summary judgment to Retirees should be affirmed.

. The Supreme Court's remand marked the case's third appearance before this court (Tackett III), which previously heard appeals from the district court’s dismissal of the complaint, Tackett v. M & G Polymers USA, LLC, 561 F.3d 478 (6th Cir.2009) (per curiam) (Tackett I), and judgment following a bench trial, Tackett v. M & G Polymers USA, LLC, 733 F.3d 589 (6th Cir.2013) (Tackett II). To maintain consistency with the case references, the appropriate Roman numeral will be used to identify our cases, and the Supreme Court case will be referenced simply as Tackett.

. Pabst presents the same issue as this case but is inapplicable because it arises under the Seventh Circuit's presumption that, under a collective bargaining agreement that is silent on the issue, entitlement to healthcare benefits expires with that agreement unless a canvass of its language reveals a patent ambiguity or there is objective evidence showing a latent ambiguity. 217 F.3d at 545, 547. That court’s consideration of latent ambiguity, however, has some relevance to our case, as the opinion recognizes that even if contract language seems clear, an examination for latent ambiguity is based on the "real-world context of application,” id. at 543, viewed under federal common law, id. at 541, which is developed pursuant to federal labor law and policy.