Justice SOTOMAYOR, concurring.
I agree with the Court that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (New York Convention), does not categorically prohibit the application of domestic doctrines, such as equitable estoppel, that may permit nonsignatories to enforce arbitration agreements. I note, however, that the application of such domestic doctrines is subject to an important limitation: Any applicable domestic doctrines must be rooted in the principle of consent to arbitrate.
This limitation is part and parcel of the Federal Arbitration Act (FAA) itself. It is a "basic precept," Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. , 559 U.S. 662, 681, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), that "[a]rbitration under the [FAA] is a matter of consent, not coercion," Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ. , 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ; see also, e.g. , Lamps Plus, Inc. v. Varela , 587 U.S. ----, ----, 139 S.Ct. 1407, 1416, 203 L.Ed.2d 636 (2019) ("Consent is essential under the FAA"); Granite Rock Co. v. Teamsters , 561 U.S. 287, 299, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) ("[T]he first principle that underscores all of our arbitration decisions" is that "[a]rbitration is strictly 'a matter of consent' "). "We have emphasized th[is] 'foundational FAA principle' many times," Lamps Plus , 587 U.S., at ----, 139 S.Ct., at 1415 (quoting Stolt-Nielsen , 559 U.S. at 684, 130 S.Ct. 1758 ) (citing cases), and even the parties find common ground on the point, see Tr. of Oral Arg. 7, 49; Brief for Respondents 2.
Because this consent principle governs the FAA on the whole, it constrains any domestic doctrines under Chapter 1 of the FAA that might "appl[y]" to Convention proceedings (to the extent they do not "conflict with" the Convention). 9 U.S.C. § 208 ; cf. ante , at 1644 - 1645. Parties seeking to enforce arbitration agreements under Article II of the Convention thus may not rely on domestic nonsignatory doctrines that fail to reflect consent to arbitrate.
*1649 While the FAA's consent principle itself is crystalline, it is admittedly difficult to articulate a bright-line test for determining whether a particular domestic nonsignatory doctrine reflects consent to arbitrate. That is in no small part because some domestic nonsignatory doctrines vary from jurisdiction to jurisdiction. With equitable estoppel, for instance, one formulation of the doctrine may account for a party's consent to arbitrate while another does not. Cf. Brief for Respondents 45 (maintaining that courts have applied at least "three different versions" of GE Energy's equitable-estoppel theory, including one that allegedly "allows a non-party to force arbitration even of claims wholly unconnected to the agreement"). Lower courts must therefore determine, on a case-by-case basis, whether applying a domestic nonsignatory doctrine would violate the FAA's inherent consent restriction.*
Article II of the Convention leaves much to the contracting states to resolve on their own, and the FAA imposes few restrictions. Nevertheless, courts applying domestic nonsignatory doctrines to enforce arbitration agreements under the Convention must strictly adhere to "the foundational FAA principle that arbitration is a matter of consent." Stolt-Nielsen , 559 U.S. at 684, 130 S.Ct. 1758. Because the Court's opinion is consistent with this limitation, I join it in full.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

In this case, however, I am skeptical that any domestic nonsignatory doctrines need come into play at all, because Outokumpu appears to have expressly agreed to arbitrate disputes under the relevant contract with subcontractors like GE Energy. The contract provided that disputes arising between the buyer and seller in connection with the contract were subject to arbitration. App. 171. It also specified that the seller in the contract "shall be understood" to include "[s]ub-contractors." Id., at 88-89. And it appended a list of potential subcontractors, one of which was GE Energy's predecessor, Converteam. Id., at 184-185.