# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 19, 2017   Decided July 3, 2018

No. 16-7134

REPUBLIC OF ARGENTINA,
APPELLANT

v.

AWG GROUP LTD.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01057)

*Matthew D. Slater* argued the cause and filed the briefs for appellant.

*Elliot Friedman* argued the cause for appellee. With him on the brief was *David Y. Livshiz*.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: An arbitration panel determined that the Republic of Argentina was liable to AWG Group Ltd.

for $20 million. Argentina challenged that decision in district court, arguing that a member of the arbitration panel had, with a connection to two of the parties to the proceeding, shown "evident partiality" under 9 U.S.C. § 10(a)(2), and that the way the panel reached its determination exceeded its authority under § 10(a)(4). The district court enforced the panel's award against Argentina, and we affirm.

I

In 1993, Argentina awarded a contract to Aguas Argentinas S.A. (AASA), a consortium of seven companies. Three were Argentine and four were not (AWG Group Ltd. ("AWG"), Sociedad General de Aguas de Barcelona S.A., Vivendi Universal, S.A. ("Vivendi"), and Suez). According to the contract, AASA agreed to invest in and operate Argentina's water services. By its terms, the contract was set to run through 2023 but allowed for earlier termination if either AASA or Argentina failed to live up to its commitments. Argentina also entered bilateral investment treaties with the home countries of the members of AASA promising fair and equitable treatment of their investments in Argentina (the "fair-treatment provisions"). These treaties also established arbitration procedures to resolve disputes that might arise from investments in the signatory countries.

At the turn of this century, Argentina's economy fell into crisis, and its government responded with emergency regulatory measures. One measure unpegged Argentina's currency, the Argentine peso, from the U.S. dollar. Another froze the tariffs AASA could charge customers. Together these measures suppressed the peso's value and prevented AASA from increasing its prices, which led to a significant loss of revenue from its services. AASA had committed to repaying

loans that were denominated in dollars and claimed that it could not pay for the quality of service that it had provided when the peso was more valuable unless something changed. Argentina denied AASA's repeated requests to alter the emergency measures or modify its obligations.

In 2003, the non-Argentine members of AASA began arbitration proceedings at the International Centre for Settlement of Investment Disputes (the "Centre") in Washington, D.C. The gravamen of their claim was that Argentina had breached its contract by treating them unfairly. Among its defenses, Argentina maintained that its conduct was compelled by the need to protect its economy and provide safe water. Three years into the arbitration, Argentina terminated the contract on the ground that AASA had failed to keep the nation's water supply free from contaminants. The arbitration lasted twelve years. At its conclusion in April 2015, a unanimous panel rejected Argentina's defense that its conduct was necessary to protect its economy and water supply and concluded that Argentina had breached the contract by treating AASA unfairly. The panel later awarded the claimants the profits they would have realized had Argentina honored the fair-treatment provisions.

In July 2015, Argentina brought suit in district court seeking to vacate the panel's award to AWG on two grounds. First, that the panel member selected by AASA was biased in favor of two of the non-Argentine consortium members. Although Argentina does not allege that the panel member had an outside interest in AWG, its fate in the arbitration was wrapped up with the fate of its fellow consortium members. Second, that the panel exceeded its authority by failing to credit Argentina's necessity defense and by compensating AASA with hypothetical profits earned after Argentina had lawfully

terminated the contract. The district court rejected each of Argentina's arguments and granted AWG's cross-petition to enforce the award. *Republic of Argentina v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 363 (D.D.C. 2016). Argentina timely appealed the district court's judgment.

II

The law of the United States governing arbitration is codified in the Federal Arbitration Act (the "Act"), 9 U.S.C. § 1 *et seq.*, which incorporates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"), in 9 U.S.C. §§ 201-08. The New York Convention is a multilateral treaty that requires signatory nations like the United States to honor the results of international arbitrations that comply with the treaty, but allows a court of the nation in which the arbitration was held to vacate the award if the proceeding violated that nation's domestic policy of fair adjudication. New York Convention art. V(2); 9 U.S.C. § 207; *Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria*, 844 F.3d 281, 283 (D.C. Cir. 2016); *TermoRio S.A. v. Electranta S.P.*, 487 F.3d 928, 935-36 (D.C. Cir. 2007). Under the New York Convention, the district court had authority to enforce or, if the arbitration violated the standards of fair adjudication set out in § 10 of the Act, vacate the award. 9 U.S.C. § 203; *see also* § 10(a). We have jurisdiction under 28 U.S.C. § 1291 to hear Argentina's appeal of the district court's decision, and we review the court's legal conclusions de novo. *See Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 355 (D.C. Cir. 2006).

As a general matter, we will enforce an arbitration award unless given a compelling reason to suspect that the award

resulted from an unfair process. *See Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008) ("[L]imited review [is] needed to maintain arbitration's essential virtue of resolving disputes straightaway."); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) ("[W]e rigorously enforce agreements to arbitrate . . . ."). Congress has pointedly endorsed private dispute resolution and directed courts to make the lawful judgments of arbitration panels effective. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) ("[Congress] specifically directed [courts] to respect and enforce . . . parties' chosen arbitration procedures."); *see also Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (describing the Act as establishing a national policy in favor of enforcing arbitration awards). Congress requires enforcement even when arbitration proceedings do not provide the full process protections that courts provide because the "primary purpose" of the Act is not to turn arbitration panels into private federal courts but to "ensure that private agreements to arbitrate are enforced according to their terms." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks and citations omitted).

If we interfere with an arbitration decision, it is only because the proceeding deviated significantly from the Act's standards of fair adjudication. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) ("Under the [Act], courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995))); *see also Hall St. Assocs.*, 552 U.S. at 586 ("Section[] 10 . . . address[es] *egregious* departures from the parties' agreed-upon arbitration . . . ." (emphasis added)). The burden to prove that there was unfair process falls on the challenger's shoulders, and it is "onerous." *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996); *see also Encyclopaedia Universalis S.A. v. Encyclopaedia Brittanica,*

*Inc.*, 403 F.3d 85, 90 (2d Cir. 2005) (describing the burden on the challenger as a "heavy one"). If it were easy to call into question the fairness of an arbitration, losing parties would have every reason to challenge the process in court. Because arbitration's "essential virtue" is the avoidance of the length and expense of litigation, courts may grant relief to a disgruntled party only when its challenge to the arbitration is compelling. *Hall St. Assocs.*, 552 U.S. at 588; *see also Epic Sys.*, 138 S. Ct. at 1621 ("[I]n Congress's judgment arbitration . . . offer[s] . . . the promise of quicker, more informal, and often cheaper resolutions for everyone involved.").

## III

Impartiality of the arbitrators is a cardinal feature of fair adjudication. In 9 U.S.C. § 10(a)(2), Congress permitted federal courts to set aside the results of arbitration "where there was evident partiality . . . in the arbitrators." Argentina contends that there was evident partiality by one of the arbitrators because she sat on the board of directors for a company with investments in two of the parties.

At the outset of the arbitration proceedings, AASA chose as an arbitrator Professor Gabrielle Kaufmann-Kohler, a professor of arbitration at the University of Geneva; Argentina chose Professor Pedro Nikken, the former President of the Inter-American Court of Human Rights; and to chair the panel, the Centre chose and the parties approved Professor Jeswald W. Salacuse, an expert in international law. Three years into the proceedings, in April 2006, international financial-services company UBS AG ("UBS") appointed panel member Kaufmann-Kohler to serve on its board of directors. She was paid for her services in part with UBS stock and in part with a cash salary.

At the time of Kaufmann-Kohler's appointment, UBS managed trillions of dollars in investments, including over $2 billion in Suez and Vivendi. Most of those investments were made for the clients of UBS, who relied on the company to manage their funds. Only a sliver of the Suez and Vivendi shares were purchased as investments for UBS. Owning shares in Suez and Vivendi made UBS a passive shareholder without a management role or entitlement to the firms' profits.

When she accepted the position on the board of directors, Kaufmann-Kohler did not know of UBS's investments in Suez and Vivendi. UBS ran a check for any conflicts of interest she might have had with the company, and as part of that process Kaufmann-Kohler reported her activity as an arbitrator, including the arbitration involving Argentina, Suez, and Vivendi. The only conflict UBS identified was Kaufmann-Kohler's upcoming participation in the jury for the America's Cup race in which UBS had sponsored a yacht. UBS did not alert her to any connection the company had with Suez or Vivendi. In fact, Kaufmann-Kohler first learned of UBS's investments in them in November 2007, when Argentina sought her recusal from the panel because of her relationship with UBS.[1] The other members of the panel rejected Argentina's challenge, concluding that UBS's interests in Suez and Vivendi were too trivial to cause a reasonable person to doubt Kaufmann-Kohler's fairness. Even so, Kaufmann-Kohler resigned from the board on April 15, 2009, more than a year

---

[1] Before this, Argentina had raised two other challenges to the panel, neither of which is part of this litigation. In August 2006, the panel rejected Argentina's challenge to its jurisdiction on various grounds. In October 2007, the panel rejected a challenge to Kaufmann-Kohler's impartiality stemming from her role as arbitrator in a previous dispute involving Argentina.

before the panel reached its decision finding Argentina liable to AASA.

We must decide whether Kaufmann-Kohler's brief service on the board obliged her to disclose to the arbitration parties her connections to Suez and Vivendi. The Act's "evident partiality" standard imposes duties on arbitrators with significant interests in the parties, a standard the Supreme Court examined in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968). There, the Court vacated an award because one of the three arbitrators did not disclose a prior substantial business relationship with a party to the arbitration proceeding. *Id*. at 150. The arbitrator's "repeated and significant" consultations for that party on various business projects generated sizeable fees over time. *Id*. at 146. Although there was no evidence that the arbitrator actually favored that party, the Court determined that his failure to disclose his interest in the party created a circumstance "[w]here there was evident partiality." *Id*. at 147-48 (quoting § 10(a)(2)).

The Court agreed that disclosure was necessary, but the Justices could not agree on a single rationale. In his plurality opinion, Justice Black proposed adopting the same standard for avoiding partiality for arbitrators that governed judges. *Id*. at 148. His rule would require arbitrators to disclose "any dealings that might create an impression of possible bias." *Id*. at 149. In his mind, failing to disclose the exchange of a single dollar between an arbitrator and a party would violate the Act, even though that transaction likely would not have influenced the arbitrator. *Id*. at 147-48.

In his concurrence, Justice White advanced a rule that relieves arbitrators from a duty to disclose trivial interests:

"[A]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id*. at 150. The exception for trivial interests relaxed the burden that a standard fit for federal judges would impose on professional arbitrators, whom Justice White distinguished as people "of affairs, not apart from but of the marketplace." *Id*. In Justice White's view, first-hand experience in the business world makes arbitrators especially adept at resolving the disagreements that arise in that world, and the Act did not create a disclosure duty so broad that it would drive away "the best informed and most capable potential arbitrators." *Id*. His interpretation of the Act would require an arbitrator to disclose an interest only when she "has a substantial interest in a firm which has done more than trivial business with a party." *Id*. at 150-52. This is the rule we follow.[2]

We applied Justice White's rule in *Al-Harbi* to uphold an award despite the arbitrator's undisclosed relationship with a party to the arbitration. 85 F.3d at 684. There, unbeknownst to the arbitrator, his former law firm had previously represented the party on matters that were unrelated to the dispute submitted to the arbitration. *Id*. at 682-83. The challenger claimed the arbitration award should be vacated for evident partiality because the arbitrator had not investigated, and of course had not disclosed, the connection. *Id*. at 682.

---

[2] We use Justice White's approach because his rule is narrower than Justice Black's. *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 n.4 (D.C. Cir. 2017) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (alteration in original) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977))).

Before considering whether evident partiality could apply when the arbitrator did not know he had an interest in the party, we first asked whether his interest was significant. *See id.* at 683. There is no duty to disclose a trivial interest under *Commonwealth Coatings* even if the arbitrator has full knowledge of his connection to the party. *Id.* We found that the challenger hadn't "establish[ed] specific facts that indicate[d] improper motives on the part of [the] arbitrator." *Id.* (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993)). Because his interest was trivial, it could not give rise to evident partiality whether he knew about the interest or not. *See id.* ("[N]othing else appearing, the fact that an arbitrator has not conducted an investigation sufficient to uncover the existence of facts marginally disclosable under the *Commonwealth Coatings* duty is not sufficient to warrant vacating an arbitration award for evident partiality.").

We emphasized in *Al-Harbi* that a challenger to an arbitrator's partiality has a steep slope to climb. *Id.* (upholding the award in "light of [the] onerous standard for vacatur"). A challenger can satisfy its heavy burden of proof only by presenting "specific facts that indicate improper motives on the part of an arbitrator." *Id.* (quoting *Peoples Sec.*, 991 F.2d at 146). We conclude that the facts Argentina sets forth fail to meet that high standard.

Argentina contends that a reasonable person would think the huge sum of money UBS invested in Suez and Vivendi biased Kaufmann-Kohler in their favor because of her position on the UBS board. This appearance of bias would, in Argentina's view, trigger a duty for Kaufmann-Kohler to disclose the investments UBS made in the parties before she

joined its board of directors. AWG responds that Kaufmann-Kohler did not need to discover and disclose the investments because her connection with Suez and Vivendi was remote—so remote, in fact, that she hadn't even known about the investments.

Neither Argentina nor AWG disputes that Kaufmann-Kohler had some degree of interest in Suez and Vivendi, but it falls to Argentina to show that the degree was significant. *See id*. Under *Commonwealth Coatings*, Argentina must first show that "the arbitrator ha[d] a substantial interest" in UBS. 393 U.S. at 151 (White, J., concurring). Argentina notes without contest that Kaufmann-Kohler's position on the board of directors gave her an interest in UBS.[3] This satisfies the first *Commonwealth Coatings* step.

AWG responds that, although her supervisory position with UBS might have given her a substantial interest in the firm, Kaufmann-Kohler's position was so far removed from investment decisions that it could not have given her a substantial interest in the parties. But AWG skips a step. The second part of the *Commonwealth Coatings* framework asks whether UBS, not Kaufmann-Kohler, "ha[d] done more than trivial business with" Suez or Vivendi. *Id*. at 152 ("[W]here the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed."). It is because Argentina does not convince us that the importance of the parties to UBS is "more than trivial," *id*., that we hold Kaufmann-Kohler had no disclosure duties.

---

[3] Although Kaufmann-Kohler also owned stock in UBS through her compensation package, we do not need to decide whether her status as a shareholder gave her a substantial interest in UBS, given that her position as a director did so.

Both Argentina and AWG agree there is more to an interest than just its commercial value. A majority of the Court in *Commonwealth Coatings* suggested that frequent deals with a party may make an arbitrator's interest significant although only small sums are exchanged. *See id*. at 146 (plurality opinion); *id*. at 150 (White, J., concurring). And we found in *Al-Harbi* that an arbitrator's relationship with a firm at which he no longer worked and that had formerly represented a party to the arbitration in an unrelated matter was too thin to be meaningful. 85 F.3d at 682-83. Neither case, however, examines the interest a passive investor has in the companies it holds.

Argentina seems to agree that the relationship UBS had with Suez and Vivendi was limited to purchasing and selling shares in the parties. UBS had no management responsibilities nor any guarantee of directly sharing in their profits. At the same time, Argentina does not explain why this kind of relationship is comparable to recurrent client relationships, which arbitrators might have wanted to retain. While Suez and Vivendi might have been interested in retaining UBS as an investor because the company owned more than 2% of their shares, Argentina does not explain how the importance of the parties' interest in UBS affects the interest UBS had in the parties. *Commonwealth Coatings* requires us to gauge the interest of Kaufmann-Kohler's firm in the parties, not their interest in her firm. We see no hint from Argentina that UBS cared about staying in the good graces of Suez and Vivendi.

Argentina proposes that the relationship UBS had with the parties was significant simply because it was ongoing while the arbitration was pending. Yet even assuming that a fresh relationship with a party is more important than one that has

gone stale, Argentina does not satisfy its heavy burden to explain why this makes the interest of a passive investor, which is far more detached than the company-client relationships it cited as examples, a substantial one. We have been given no reason to think that the Act proscribes the relationships UBS had with Suez and Vivendi simply because they coincided with the arbitration.

That leaves Argentina to rely on the sheer number of dollars UBS had wrapped up in the parties as evidence of significance. We agree that the more than $2 billion UBS had invested in Suez and Vivendi added up, to state the obvious, to a significant sum. However, Argentina forgets to put that number in context. UBS is in the business of managing money by purchasing and selling shares in corporations. The $2 billion that UBS invested in Suez and Vivendi made up less than 0.06% of the $3.6 trillion UBS had in invested assets. That percentage is too small to suggest much significance, and Argentina does not provide additional context to persuade us otherwise.

We have no problem agreeing with Argentina that UBS was interested in the success of companies in which it had invested $2 billion, no matter what percentage of its portfolio that amount made up. However, Argentina fails to put forth any specific facts beyond the dollars invested to show why that interest was more than trivial to such a mammoth investment firm. Speculation that UBS's investment of 0.06% of its assets, most of which was credited to its clients and not its own bottom line, created a substantial interest in Suez and Vivendi is simply not enough to satisfy the Act's high standard of proof.

Argentina does not give us reason to find that the passive investments UBS made in Suez and Vivendi created evident

partiality in Kaufmann-Kohler. If the interest presented here could disqualify an arbitrator who did not disclose it, parties would hesitate to select arbitrators associated with financial companies that invest broadly. The risk would be too high that "evident partiality" challenges, like Argentina's, could uproot results of decade-long arbitrations without any evidence of bias beyond a diversified portfolio. *See Epic Sys.*, 138 S. Ct. at 1623 (warning courts to "be alert to new devices and formulas that would" undermine the Act's endorsement of arbitration). Requiring arbitrators to either avoid working for companies with sophisticated financial strategies or investigate the far reaches of their investment plans would upset the balance between experience and neutrality struck in *Commonwealth Coatings*. And nothing in our decision here prevents parties who seek additional protection from agreeing that the arbitrators of their disputes must make known trivial passive-investor relationships that would not trigger the Act's rule.

Because UBS's interests in Suez and Vivendi were trivial, and therefore Kaufmann-Kohler's interests in these parties were insignificant, they could not have created evident partiality, and there is no basis for vacating the panel's award under § 10(a)(2). *See Al-Harbi*, 85 F.3d at 683.

IV

Argentina next argues the panel exceeded its authority by rejecting the country's necessity defense without explanation and by basing the award on events that Argentina prevented by canceling the contract. The Act authorizes vacatur of an award if "the arbitrators exceeded their powers" under the arbitration agreement. § 10(a)(4). The bar is high: courts may disturb an award only if the challenger can show that it was inconsistent with the panel's own understanding of the award that was

authorized by the agreement. *See Stolt-Nielsen*, 559 U.S. at 671-72. Argentina tries, but fails, to show that the panel's decision had no basis in the governing arbitration agreement.

Argentina contends that the panel failed to fully consider its necessity defense. Necessity is a well-known principle of international law that, as presented by Article 25 of the International Law Commission Articles on Responsibility of States for Intentionally Wrongful Acts, would excuse Argentina from liability if its breach of the fair-treatment provisions was the "only means for the State to safeguard an essential interest against a grave and imminent peril" that Argentina had not itself caused.[4] During the arbitration proceeding, Argentina alleged that the unforeseen economic crisis had limited its ability to accommodate AASA's requests while preserving safe water services for the country's residents and resuscitating its economy. The panel rejected Argentina's assertions with brief conclusions, left unsupported by particular evidence, about the panel's understanding of the government's role in the crisis and the actions it might have taken to comply with the fair-treatment provisions. Argentina interprets the cursory dismissal as suggesting that the panel based its decision on its own policy preferences instead of the criteria to which the parties had agreed. Otherwise, Argentina reasons, the panel would have addressed with care each of Argentina's arguments that it breached the fair-treatment provisions out of necessity.

We have never required of an arbitration award the sort of extended explanation Argentina urges. In fact, we have determined that a panel's decision may be upheld even if it

---

[4] AWG does not dispute that the defense in Article 25 would apply to Argentina if satisfied. *See* AWG Br. 54.

offered no explanation at all because the alternative, requiring a particular level of detail for every response to each party's theories, would "unjustifiably undermine the speed and thrift sought" from arbitration proceedings. *Sargent v. Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 532 (D.C. Cir. 1989) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

An unexplained decision might show that a panel exceeded its powers if there is good reason to suspect that the decision relied on factors prohibited by the arbitration agreement. *See id.* But Argentina did not point to anything in the record suggesting that the panel rejected the defense to suit its own preferences instead of the criteria set out in the agreement. Without such a showing, we have no reason to suspect that the panel strayed from the arbitration agreement. And without more, we will not disturb the panel's decision.

Argentina also argues the panel exceeded its powers when it calculated the damages Argentina owed AASA by estimating the profits each member of the consortium would have received had Argentina complied with the fair-treatment provisions. The final award included estimated profits from 2002, the time at which Argentina began treating AASA unfairly, until 2023, the default expiration date of the contract. The panel reasoned that in a world in which Argentina treated AASA fairly and equitably, Argentina would have granted the consortium some relief from the country's emergency economic policies and preserved, not canceled, the contract.

According to AWG, it was reasonable for the panel to assume that the contract would have lasted past 2002 had there been no breach, and so it was appropriate for the panel's award to include estimated profits from the years 2006 through 2023.

Argentina takes issue with the panel's assumption that the contract would have continued past 2006, the time at which Argentina actually terminated the contract. But the government fails to show how the arbitration agreement prohibits making that assumption. Argentina also fails to prove that the panel exceeded its powers by basing AWG's compensation on payments that were not discounted to account for the risk of lawful termination. Even had the panel erroneously overestimated the probability that Argentina would have granted relief to AASA and ignored the risk of contract termination, we would still uphold the panel's decision as the result of its good-faith understanding of the type of compensation permitted by the arbitration agreement. *See Oxford Health Plans*, 569 U.S. at 572-73; *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987) ("The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.").

V

Argentina also asks us to vacate the award under the New York Convention for the same reasons it asked us to vacate the award under the Act. For the same reasons we could not vacate the award under the Act, we cannot vacate it under the New York Convention. *See* 9 U.S.C. § 208; *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 290 (3d Cir. 2010) (explaining that the Act provides broader, not narrower, grounds for vacatur than the New York Convention).

18

## VI

We conclude that Argentina has not satisfied the Act's or the New York Convention's elements required to vacate the award. We affirm the district court's judgment.

*So ordered.*