[Cite as *Hughes v. Hughes*, 2020-Ohio-4882.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

MARTIN J. HUGHES, III,

    PLAINTIFF-APPELLANT,

    v.

CARL F. HUGHES,

    DEFENDANT-APPELLEE.

CASE NO. 9-19-88

**O P I N I O N**

Appeal from Marion County Common Pleas Court
Trial Court No. 19CV0605

**Judgment Affirmed**

**Date of Decision: October 13, 2020**

**APPEARANCES:**

    *Julia B. Meister* **for Appellant**

    *Christopher J. Hogan* **for Appellee**

**PRESTON, J.**

{¶1} Plaintiff-appellant, Martin J. Hughes, III ("Martin"), appeals the December 10, 2019 decision of the Marion County Court of Common Pleas dismissing his motion to vacate an arbitrator's award. For the reasons that follow, we affirm.

{¶2} This case arises from a dispute concerning the right to vote certain shares in the Fahey Banking Company ("Fahey"). Martin and defendant-appellee, Carl F. Hughes ("Carl"), are the surviving sons of Natalie Hughes ("Natalie"). At one time, Natalie held a majority of the shares of Fahey common stock. In January 2004, Natalie was the record holder of 10,669 shares of Fahey common stock, which represented approximately 54.72 percent of the outstanding shares of Fahey common stock as of November 25, 2003. (Doc. No. 1, Ex. B). Natalie also possessed a beneficial interest in additional shares of Fahey common stock as well as potential voting rights arising from a number of proxy agreements. (*Id.*).

{¶3} On January 15, 2004, Martin, Carl, and Natalie entered into a Revised and Restated Irrevocable Stockholder's Agreement and Proxy ("RISAP"). (*Id.*). Under the terms of the RISAP, Martin and Carl were irrevocably appointed to serve as Natalie's proxies, and each was given the right to vote one-half of the "Subject Shares," which were defined as "all shares of Fahey common stock that [Natalie] beneficially own[ed] or otherwise [had] voting control over as of [January 15,

2004]," "any shares or voting rights of Fahey common stock that [Natalie] [held] after [January 15, 2004]," "any other shares of voting securities or voting rights over such shares of voting securities that [Natalie] [acquired] after [January 15, 2004]," and "any shares of voting stock or voting rights over such shares that result from the exchange or conversion of Fahey voting securities beneficially owned by [Natalie] or for which [Natalie] [held] voting rights after [January 15, 2004]." (*Id.*). In the event that the Subject Shares were uneven in number, Carl was appointed Natalie's proxy "to vote a number of Subject Shares that is one greater than the number of Subject Shares as to which [Martin] holds a proxy * * *." (*Id.*). Furthermore, if either Martin or Carl became unable to vote their Subject Shares "due to death or incapacity," the other was appointed Natalie's proxy to vote all of the Subject Shares. (*Id.*).

{¶4} In addition, the RISAP contained provisions governing the transfer of the Subject Shares and the effect that any such transfer would have on the proxies granted to Martin and Carl. Under the RISAP, if Natalie desired to transfer any of the Subject Shares that she owned to any person other than Martin, Carl, or another of her descendants, Natalie was required to furnish Martin and Carl with a notice of her intention to transfer. (*Id.*). After receiving such notice, Martin and Carl would have 30 days to exercise a right of first refusal, under which Martin and Carl were entitled to purchase the Subject Shares "on a pro rata basis in proportion to the

respective number of Subject Shares over which [they] [held] an irrevocable proxy pursuant to [the RISAP]." (*Id.*). In the event that Martin and Carl did not elect to purchase the Subject Shares, Natalie could proceed to transfer the Subject Shares as intended, provided that "any such transferee w[ould] succeed to all of the rights and obligations of [Natalie] [under the RISAP] with respect to the Subject Shares, and no such transfer of Subject Shares [could] be effected unless the transferee * * * executed and delivered to [Martin, Carl, and Natalie] an agreement to be bound by all of the terms and provisions [of the RISAP]." (*Id.*). However, the RISAP provided that "[n]otwithstanding anything * * * to the contrary, [Natalie] [could] transfer Subject Shares to any Family Member or other descendant of [Natalie] without complying [with the notice and right-of-first-refusal provisions]. Upon the transfer of any Subject Shares to any Family Member, such shares w[ould] cease to constitute Subject Shares for purposes of [the RISAP]." (*Id.*). Martin and Carl were each defined in the RISAP as a "Family Member" and collectively as "Family Members." (*Id.*).

{¶5} Finally, the RISAP contained an arbitration clause. Under this provision, Martin, Carl, and Natalie "agree[d] that any and all disputes, claims or controversies arising out of or relating to [the RISAP] that are not resolved by * * *

-4-

mutual agreement shall be submitted to final and binding arbitration before JAMS

* * *."[1]  (Doc. No. 1, Ex. B).

{¶6} In May 2005, after Martin, Carl, and Natalie had entered into the RISAP, Natalie created the "Natalie A. Hughes 2005 Trust" (the "Trust"), which she amended several times, including on July 8, 2017.  (*See* Doc. No. 17, Ex. C).  In the document creating the Trust (the "Trust Agreement"), Natalie was designated as the original trustee.  (*Id.*).  The Trust Agreement specified that if Natalie ceased to act as trustee, Martin and Carl would proceed to act as successor co-trustees.  (*Id.*).  Moreover, the Trust Agreement provided that "[i]f either Carl or Martin is unable, fails, or ceases to act as trustee, then the other shall act as sole trustee without the execution of any further instrument."  (*Id.*).

{¶7} At some point, a substantial portion of Natalie's Fahey interests was transferred to the Trust.  (*See* Doc. No. 1, Exs. D, F).  The Trust Agreement contained a provision directing how these interests were to be distributed, which provided, in relevant part:

> This provision governs the disposition of all my rights and interests in
>
> [Fahey], * * * shares of common stock owned by me or for my benefit
>
> and any shares of [Fahey] common stock which I hold the option to

---

[1] Although now known only as JAMS, at its founding, JAMS was an acronym for Judicial Arbitration and Mediation Services, Inc.  JAMS, *What does JAMS stand for?*, https://www.jamsadr.com/about-the-jams-name/ (accessed October 5, 2020).

acquire and/or vote (collectively "Fahey Bank Interests"). All my

Fahey Bank Interests are subject to the terms and conditions of [the

RISAP] * * *, which contains restrictions on the transferability of my

Fahey Bank Interests.

For purposes of administering the disposition of my Fahey Bank

Interests hereunder, my intention and desire is Carl, Martin[,] and

[Natalie's predeceased son, Paul Hughes's] collective descendants

each receive one-third of my Fahey Bank Interests * * *.

* * * [T]he Trustee shall distribute one-third of my Fahey Bank

Interests to each of Carl and Martin and shall continue to hold the

remaining one third of my Fahey Bank Interests in trust for the benefit

of [Paul Hughes's children] * * *. Effective as of my date of death,

for purposes of clarification, I desire and intend that the one-third

shares of my Fahey Bank Interests distributable to Carl and Martin no

longer constitute "Subject Shares" as that term is defined in the

[RISAP].

(Doc. No. 17, Ex. C). Finally, like the RISAP, the Trust Agreement contained an

arbitration clause. (*Id.*).

{¶8} Natalie died on July 13, 2017. (Doc. No. 1, Ex. D). Thereafter,

pursuant to the terms of the Trust Agreement, Martin and Carl began serving as co-

trustees. (*See id.*). However, disputes soon arose between Martin, Carl, and other interested parties concerning the administration of the Trust and the distribution of Trust property. (*See id.*). Among other claims, it was alleged that Carl violated his fiduciary duties by delaying the distribution of Fahey stock to the beneficiaries of the Trust in contravention of Natalie's wishes. (*See id.*). As dictated by the terms of the Trust Agreement, this matter and others were submitted to binding arbitration. (*Id.*). On October 25, 2018, the trust arbitrator issued his decision, in which he concluded that Carl's failure to advance the administration of the Trust constituted a material breach of trust. (*Id.*). As a result, the trust arbitrator ordered that Carl be suspended as co-trustee of the Trust for 90 days, effective November 1, 2018, and that "Martin * * * serve as sole trustee with full power and authority" during the duration of Carl's suspension. (*Id.*).

{¶9} Shortly thereafter, on November 19, 2018, the 2018 annual Fahey shareholder meeting was held. (Doc. No. 1, Exs. E, F). At the meeting, Martin and his associates voted to appoint three inspectors of elections. (*See* Doc. No. 1); (*See* Doc. No. 8, Ex. D). Martin claimed that he himself controlled a majority of the voting rights present at the meeting and that, along with the votes of his supporters, there was a clear majority in favor of appointing his preferred inspectors of elections. (*See* Doc. No. 1); (*See* Doc. No. 8, Ex. D). Yet, Carl and Fahey refused to recognize the inspectors that Martin and his faction of shareholders voted to

appoint. (*See* Doc. No. 1); (*See* Doc. No. 8, Ex. D). Instead, Carl and his allied shareholders moved to proceed with an inspector of elections they had appointed prior to the meeting. (*See* Doc. No. 1, Ex. F); (*See* Doc. No. 8, Ex. D). Moreover, despite Martin's objections and his demand that the meeting be adjourned, Carl and his faction of shareholders continued to conduct bank business. (*See* Doc. No. 1, Ex. F); (*See* Doc. No. 8, Ex. D). According to Martin, at the shareholder meeting, there was no record taken of the number of shares present or of who could vote the shares, and the results of the elections were not announced. (Doc. No. 1).

{¶10} As a result of Carl's attempt to install his own preferred inspector of elections and his continuation of Fahey business over Martin's objections and requests for adjournment, Martin filed a complaint requesting that the trial court issue a temporary restraining order ("TRO") and an injunction against Fahey and its chief operating officer. (*See* Doc. No. 1, Exs. E, F). Carl was not named as a defendant in the action, and although Carl attempted to intervene, he was unsuccessful. (*See* Doc. No. 1); (*See* Doc. No. 8, Exs. A, B). However, Martin contends that Carl "direct[ed] [Fahey's] litigation positions as [Fahey's] then-President and CEO, and ha[d] his personal counsel present through the proceedings * * *." (Doc. No. 1). On November 20, 2018, the trial court granted Martin's request for a TRO, finding that "allowing certification of the results of an annual meeting of shareholders when it is doubtful that a proper inspector of elections has

been appointed, and the denial of access to corporate records, amounts to suppression of shareholder rights and irreparable harm." (Doc. No. 1, Ex. E). Accordingly, the trial court ordered that the election results from the 2018 annual shareholder meeting not be certified until further court order, that the 2018 annual shareholder meeting be held in adjournment until further court order, and that Fahey immediately produce certain records requested by Martin. (*Id.*). Nevertheless, on December 2, 2018, the inspector of elections appointed by Carl and his associates certified the election results from the 2018 annual shareholder meeting. (Doc. No. 1, Ex. F).

{¶11} On December 3, 2018, the trial court held a hearing on Martin's request for a preliminary injunction. (*Id.*). On December 20, 2018, the trial court granted Martin's request and issued a preliminary injunction. (*Id.*). The trial court observed that Martin's claim for injunctive relief was based on his assertion that the annual meeting should have been adjourned until there was a determination whether there were sufficient votes to pass his motion to appoint his preferred inspectors. (*Id.*). The trial court also noted Martin's contention that he "had sufficient votes directly, as trustee [of trusts other than the Trust], and by proxy, to constitute a majority of shareholder votes at the meeting, and that he had the authority to vote 4,389 shares as trustee for [the Trust], pursuant to [the trust] arbitrator's decision issued on October 25, 2018." (*Id.*).

{¶12} The trial court agreed with Martin. The trial court stated that under normal circumstances, the RISAP enabled Martin and Carl to each vote one-half of the Fahey shares held in the Trust. (*Id.*). However, it found that "things were not normal as of the time of the November 19, 2018 annual meeting, as Carl * * * was suspended as trustee of the Trust on the date of the annual meeting pursuant to the [trust] arbitrator's decision." (*Id.*). The trial court concluded that "[a]s a result of the [trust arbitrator's] decision, Carl * * * was under a legal disability from voting the Subject Shares under the RISAP proxy agreement." (*Id.*). Furthermore, the trial court concluded that "[w]ith Carl * * * being under incapacity to vote the Subject Shares, under the provisions of * * * the RISAP, Martin * * * was granted the authority under the RISAP to vote all of the Subject Shares of the [Trust]." (*Id.*).

{¶13} Having concluded that Martin had the right to vote all of the shares of Fahey stock held in the Trust on the date of the 2018 annual meeting, the trial court further held that Martin would have controlled a majority of the votes at the 2018 annual meeting and that, consequently, the inspector appointed by Carl's faction did not correctly count the number of votes that Martin was authorized to cast at the 2018 annual meeting. (Doc. No. 1, Ex. F). As a result, the trial court vacated the December 2, 2018 certification of the results of the 2018 annual meeting, ordered that the 2018 annual meeting be held in adjournment and rescheduled, and ordered that, at the rescheduled meeting, a majority of shareholders present and entitled to

vote appoint three inspectors of elections before proceeding to conduct ordinary business. (*Id.*).

{¶14} The rescheduled 2018 annual meeting was held on January 10, 2019. At the meeting, Martin succeeded in voting all of the Fahey shares held in the Trust. (*See* Doc. No. 1, Ex. A). The shareholders elected new directors, and Martin became the President of Fahey. (*See* Doc. No. 1, Ex. C). On January 15, 2019, Martin voluntarily dismissed the injunction action. (*See* Doc. No. 8, Ex. C).

{¶15} While Martin and Carl were arbitrating their Trust disputes and litigating the handling of the 2018 annual shareholder meeting, a second arbitration between Martin and Carl was slowly moving forward. On February 2, 2018, Martin submitted a demand for JAMS arbitration in accordance with the terms of the RISAP. (Doc. No. 17, Ex. A). Martin demanded arbitration "to determine the voting rights regarding certain shares of stock (including options and proxies relating to stock) in the Fahey Banking Company under the [RISAP] * * *." (*Id.*). Later, Martin clarified that the dispute arose after Carl "apparently caused the improper voting" of the Subject Shares and "caused Fahey * * * to prevent the shareholders from knowing how the shares were voted." (Doc. No. 17, Ex. B). Martin sought "a declaration that [certain shares] [were] Subject Shares under the [RISAP] and that [he] and Carl [were] each entitled to vote half of these shares." (*Id.*). After the trial court issued the preliminary injunction, Carl "filed an

'emergency motion' with the JAMS arbitrator * * * demand[ing] declaratory relief about the allocation of voting rights under the RISAP." (Doc. No. 1). Specifically, Carl sought "a declaration * * * that all of the shares in [Fahey] transferred into [the Trust] are subject to the terms of the RISAP thereby granting Martin fifty percent of the voting rights to such shares and Carl fifty percent of the voting rights to such shares * * *." (Doc. No. 1, Ex. A).

{¶16} The JAMS arbitrator issued his decision on September 5, 2019. (*Id.*). First, the JAMS arbitrator observed that Martin "alleged that both he and * * * Carl had signed the RISAP in their 'individual capacities'" and found that a reading of the RISAP "confirms this fact." (*Id.*). In addition, the JAMS arbitrator noted both the trial court's determination that "because Carl was suspended from his duties as a trustee of [the Trust], he was thus somehow under an incapacity to exercise his voting rights under the RISAP" and the fact that Carl was not a party to the injunction action "despite an application (ultimately unsuccessful) to intervene." (*Id.*).

{¶17} After laying out this background information, the JAMS arbitrator made the following findings:

> The determination of the [trial court] in the case to which * * * Carl *
> * * was not a party was simply in error. As * * * Martin * * * himself
> alleged at the beginning of this arbitration, equal voting rights to his

mother's shares of stock in [Fahey] were granted to him and his brother in their individual capacities by virtue of the 2004 RISAP. Those voting rights were assigned to and thus owned by both Martin and Carl in their individual capacities as of January 15, 2004. Any subsequent transfer of the shares by Natalie * * * into the [Trust] would have meant that the shares so transferred were "stripped" of their voting rights by virtue of the 2004 RISAP. Indeed, a July 8, 2017 Amendment and Restatement of the Trust * * * expressly states that all of her interests in Fahey Bank stock "are subject to the terms and conditions of the [2004 RISAP]." Carl's status as a temporarily suspended trustee of [the Trust] had nothing whatsoever to do with his rights under the 2004 RISAP to vote half of his mother's shares as he wished. The [trial court] clearly conflated the issue of ownership of the shares by the Trust (stripped as they were of their voting rights in 2004) with the separately assigned voting rights which were individually owned by Martin and Carl and not in any way assets of the Trust. Carl's suspension as a trustee was simply irrelevant to the issue of his voting rights.

Even if the language of the 2017 Amendment and Restatement of the [Trust] wasn't clear and unambiguous, which it patently is, Martin's

current opposition to [Carl's] application would violate the principal [sic] of judicial estoppel.

(*Id.*). Furthermore, the JAMS arbitrator addressed Martin's argument that "any transfer of Fahey Bank stock out of [the Trust] effects a removal of such transferred stock from the voting rights provisions of the RISAP which allocates the voting rights 50 percent to him and 50 percent to his brother." (*Id.*). The JAMS arbitrator concluded:

> This argument misconstrues the plain language of the RISAP. * * * [T]he RISAP permitted Natalie to transfer shares "to any Family Member" (Family Member having been previously defined as Carl and Martin) or other descendant of Natalie without complying with a right of first refusal to purchase the shares [previously] granted to Carl and Martin * * *. In the event of such a transfer, the shares would no longer constitute "Subject Shares" governed by the voting rights provisions of the RISAP. * * * However, any remaining Fahey Bank stock owned by Natalie became a trust asset upon her death and any subsequent transfers of such stock out of the trust after her death simply do not constitute transfers by her under * * * the RISAP. Stated differently, any stock transferred out of the Trust would still be

subject to the voting rights restriction of the RISAP, something which, as aforesaid, the Trust itself expressly recognized.

(*Id.*).

{¶18} Based on these findings and conclusions, the JAMS arbitrator issued the following award:

(1)  The voting rights as to all shares in [Fahey], now held or previously held, by [the Trust] are controlled by the terms of the [RISAP], which grants Martin * * * 50 percent and Carl * * * 50 percent (plus one, in the event of an uneven number of such shares) of such voting rights;

(2)  The voting rights established under the RISAP were not and cannot be impacted by Carl's temporary suspension as a co-trustee of the [Trust];

(3)  That only a direct transfer of shares from Natalie * * * during her life to Carl, Martin, or any of her descendants is sufficient to remove said shares from the "Subject Shares" designation under the RISAP[.]

(Doc. No. 1, Ex. A).

{¶19} On September 20, 2019, Martin filed a "Complaint and Petition to Vacate Arbitration Award and for Injunctive Relief," in which he sought an order

vacating the JAMS arbitrator's award.[2] (Doc. No. 1). Martin argued that the JAMS arbitrator exceeded his authority by "overturn[ing] an explicit decision from [the trial court]" and "tr[ying] to impose his own interpretation of a document never within the scope of his authority—i.e., he interpreted the [Trust Agreement]." (*Id.*). On October 4, 2019, Carl filed a memorandum in opposition to Martin's motion. (Doc. No. 8). On November 25, 2019, Martin filed a reply brief in support of his motion. (Doc. No. 17). In his reply brief, Martin put forward the additional argument that the JAMS arbitrator's award should be vacated because the JAMS arbitrator misapplied the doctrine of judicial estoppel. (*See id.*). On December 10, 2019, the trial court dismissed Martin's motion with prejudice. (Doc. No. 18). The trial court concluded that its earlier ruling in the injunction action "did not foreclose Carl from seeking a determination of rights through the JAMS arbitrator." (*Id.*). It also held that because the "arbitrator's finding can be found squarely in the RISAP" and the JAMS arbitrator was "just applying clear law," the JAMS arbitrator did "not exceed[] his authority in this matter." (*Id.*). However, the trial court did not make any findings responsive to Martin's argument that the JAMS arbitrator misapplied the doctrine of judicial estoppel. (*See id.*).

---

[2] The same day, Carl filed a separate application to confirm the JAMS arbitrator's award in the Franklin County Court of Common Pleas. (Appellant's Brief at 2); (Appellee's Brief at 6). On December 17, 2019, the Franklin County court, relying on the trial court's ruling to dismiss Martin's motion to vacate the JAMS arbitrator's award, granted Carl's application to confirm the award. (Appellant's Brief at 2); (Appellee's Brief at 6). An appeal from that decision is currently pending before the Tenth District Court of Appeals. (Appellant's Brief at 2); (Appellee's Brief at 6).

{¶20} On December 18, 2019, Martin filed a notice of appeal. (Doc. No. 20). He raises one assignment of error for our review.

**Assignment of Error**

**The trial court below erred in denying Martin's application to vacate the JAMS award.**

{¶21} In his assignment of error, Martin argues that the trial court erred by dismissing his motion to vacate the JAMS arbitrator's award. Martin argues that there are two independent grounds supporting vacation of the JAMS arbitrator's award. First, Martin contends that the JAMS arbitrator's award should be vacated because "[t]he arbitrator exceeded his authority by making findings as to the Trust Agreement—a document over which he lacked authority to arbitrate disputes—which led him to effectively overrule a decision by an Ohio court." (Appellant's Brief at 7). In addition, Martin maintains that the JAMS arbitrator's award should be vacated because "[t]he arbitrator manifestly misapplied the law of judicial estoppel." (*Id.*).

{¶22} "[W]hen reviewing a decision of a common pleas court confirming, modifying, vacating, or correcting an arbitration award, an appellate court should accept findings of fact that are not clearly erroneous but decide questions of law de novo." *Portage Cty. Bd. of Dev. Disabilities v. Portage Cty. Educators' Assn. for Dev. Disabilities*, 153 Ohio St.3d 219, 2018-Ohio-1590, ¶ 26. "[H]owever, * * * our review is not a de novo review of the merits of the dispute as presented to the

arbitrator." *Adams Cty./Ohio Valley Local School v. OAPSE/AFSCME, Local 572*, 4th Dist. Adams No. 16CA1034, 2017-Ohio-6929, ¶ 18, citing *Jackson Cty. Sheriff v. Fraternal Order of Police Ohio Labor Council, Inc.*, 4th Dist. Jackson No. 02CA15, 2004-Ohio-3535, ¶ 19-20. Instead, we review a trial court's decision whether to vacate an arbitration award "de novo to see whether any of the statutory grounds for vacating [the] award exist." *Id.*

{¶23} The statutory grounds for vacating an arbitrator's award are contained in R.C. 2711.10.[3] As relevant here, R.C. 2711.10 provides that "the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if * * * [t]he arbitrators exceeded their powers * * *." R.C. 2711.10(D). "'[T]he question whether an arbitrator has exceeded his authority is a question of law.'" *Portage Cty.* at ¶ 25, quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 974 (6th Cir.2000).

{¶24} "Once an arbitrator has made an award, it cannot be easily overturned * * *." *Fraternal Order of Police Capital City Lodge No. 9 v. Reynoldsburg*, 10th Dist. Franklin Nos. 12AP-451 and 12AP-452, 2013-Ohio-1057, ¶ 23, citing *Queen*

---

[3] Throughout the trial court proceedings, Martin asserted that vacation of the JAMS arbitrator's award is also warranted under R.C. 2711.11. (*E.g.*, Doc. No. 17). Martin makes the same assertion on appeal. (Appellant's Brief at 7-8). However, R.C. 2711.11 provides only that a court "shall make an order *modifying* or *correcting* the award" if any one of three conditions is found to exist. (Emphasis added.) R.C. 2711.11. By its terms, R.C. 2711.11 does not allow for the vacation of an arbitrator's award on the basis of any of the grounds listed therein. In his trial court filings and in his appellate briefs, Martin never requests that the JAMS arbitrator's award be modified or corrected in any respect. Rather, Martin requests only that the JAMS arbitrator's award be vacated. (Doc. Nos. 1, 17); (Appellant's Brief at 16). Accordingly, we limit our analysis to R.C. 2711.10, which supplies the sole statutory grounds for vacating an arbitrator's award.

*City Lodge No. 69, Fraternal Order of Police v. Cincinnati*, 63 Ohio St.3d 403, 407 (1992); *see Cedar Fair, L.P. v. Falfas*, 140 Ohio St.3d 447, 2014-Ohio-3943, ¶ 5 ("[T]he statutory authority of courts to vacate an arbitrator's award is extremely limited."). "Reviewing courts cannot review claims of factual or legal error with respect to the exercise of an arbitrator's powers." *Summit Cty. Sheriff v. Fraternal Order of Police*, 9th Dist. Summit No. 28019, 2017-Ohio-72, ¶ 8, citing *Martins Ferry City School Dist. Bd. of Edn. v. Ohio Assn. of Pub. School Emps.*, 7th Dist. Belmont No. 12 BE 15, 2013-Ohio-2954, ¶ 18. "'"As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."'" *Id.*, quoting *Summit Cty. Bd. of Mental Retardation & Dev. Disabilities v. Am. Fed. of State, Cty. & Mun. Emps.*, 39 Ohio App.3d 175, 176 (9th Dist.1988), quoting *United Paperworkers Internatl. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364 (1987); *Cedar Fair* at ¶ 6, quoting *Stolt-Nielsen, S.A. v. AnimalFeeds Internatl. Corp.*, 559 U.S. 662, 671, 130 S.Ct. 1758 (2010). "Generally, if the arbitrator's award is based on the language and requirements of the agreement, the arbitrator has not exceeded his powers." *Northwest State Community College v. Northwest State Community College Edn. Assn. OEA/NEA*, 3d Dist. Henry No. 7-16-11, 2016-Ohio-8393, ¶ 33, citing *Bd. of Trustees of Miami*

*Twp. v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 81 Ohio St.3d 269, 273 (1998).

{¶25} Yet, arbitrators do not possess boundless authority to interpret and enforce the parties' contract. Because "[t]he authority of an arbitrator to interpret and enforce a contract is drawn from the contract itself, * * * 'an arbitrator's authority is limited to that granted him by the contracting parties * * *.'" *Cedar Fair* at ¶ 5, quoting *Goodyear Tire & Rubber Co. v. Local Union No. 200, United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 42 Ohio St.2d 516, 519 (1975). "'"[A]n arbitrator is confined to interpretation and application of the [contract]; he does not sit to dispense his own brand of industrial justice."'" *Id.* at ¶ 7, quoting *Ohio Office of Collective Bargaining v. Ohio Civil Serv. Emps. Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177, 180 (1991), quoting *United Steelworkers of Am. v. Ent. Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358 (1960).

{¶26} Though an arbitrator's authority is frequently expansive, he exceeds it "'if the award does not draw its essence from the * * * agreement.'" *Adams Cty./Ohio Valley Local School*, 2017-Ohio-6929, at ¶ 20, quoting *Reynoldsburg* at ¶ 23, citing *Queen City Lodge No. 69* at 406. "An arbitrator's award draws its essence from a[n] * * * agreement 'when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious, or unlawful.'" *Id.*, quoting *Reynoldsburg* at ¶ 23, citing *Mahoning Cty. Bd. of Mental*

*Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.*, 22 Ohio St.3d 80 (1986), paragraph one of the syllabus. Stated differently, "[a]n arbitrator's award draws its essence from an agreement when (1) the award does not conflict with the express terms of the agreement and (2) the award has rational support or can be rationally derived from the terms of the agreement." *Northwest State* at ¶ 33, citing *Ohio Civil Serv. Emps. Assn., Local 11* at syllabus. "Once it is determined that the arbitrator's award draws its essence from the * * * agreement and is not unlawful, arbitrary or capricious, a reviewing court's inquiry for purposes of vacating an arbitrator's award pursuant to R.C. 2711.10(D) is at an end." *Bd. of Edn. of the Findlay City School Dist. v. Findlay Edn. Assn.*, 49 Ohio St.3d 129 (1990), paragraph two of the syllabus.

{¶27} As stated above, Martin advances two arguments for why the JAMS arbitrator's award should be vacated. We begin with Martin's first argument, namely, that the JAMS arbitrator exceeded his authority by interpreting the Trust Agreement, a document he had no power to interpret, in a way that conflicts with a prior decision of the trial court. Martin notes that under the terms of the RISAP, the JAMS arbitrator "had the authority to interpret the RISAP—and only the RISAP." (Appellant's Brief at 8). Martin maintains, however, that the JAMS arbitrator "decided that he had the extraordinary power to interpret the Trust Agreement" and that the only way the JAMS arbitrator could reach some of his conclusions was by

"interpreting the Trust Agreement and determining which shares the Trust Agreement left subject to the RISAP." (*Id.* at 9-10). Martin finds evidence for his claim that the JAMS arbitrator "relied on the Trust Agreement" in the JAMS arbitrator's "opin[ion] on whether 'the language of the [Trust Agreement]' was ambiguous" and in other references to the Trust Agreement throughout the JAMS arbitrator's decision. (*Id.* at 10); (Appellant's Reply Brief at 4).

{¶28} Martin is at least correct that, throughout his decision, the JAMS arbitrator repeatedly referred to the Trust Agreement, quoted some of the language contained in the Trust Agreement, and commented on the clarity of the language in the Trust Agreement. For example, the JAMS arbitrator quoted the Trust Agreement for the proposition that all of Natalie's interests in Fahey were subject to the terms and conditions of the RISAP. (Doc. No. 1, Ex. A). Furthermore, the JAMS arbitrator opined that the terms of the Trust Agreement were "patently" "clear and unambiguous" and that the Trust Agreement "expressly recognized" that "any stock transferred out of the [Trust] would still be subject to the voting rights restriction of the RISAP." (*Id.*).

{¶29} Nevertheless, we disagree with Martin's contention that these references signal that the JAMS arbitrator improperly interpreted the Trust Agreement, and we further disagree with Martin that the outcome reached by the JAMS arbitrator was possible only if the JAMS arbitrator construed the RISAP

together with the Trust Agreement. While we stop short of saying that the JAMS arbitrator's references to and opinions about the Trust Agreement were entirely appropriate, upon reading the JAMS arbitrator's decision as a whole, it is clear that the award was not derived from the JAMS arbitrator's interpretation and application of the terms of the Trust Agreement. Instead, the JAMS arbitrator's award was based on his personal interpretation and application of the RISAP; his citations to the Trust Agreement simply served to reinforce conclusions he drew by interpreting the RISAP independently from the Trust Agreement.

{¶30} One excerpt from the award, quoted in full above, is illustrative on this point. This passage reads, "Any subsequent transfer of the shares by Natalie * * * into the [Trust] would have meant that the shares so transferred were 'stripped' of their voting rights by virtue of the 2004 RISAP. Indeed, a July 8, 2017 Amendment and Restatement of the Trust * * * expressly states that all of her interests in Fahey Bank stock 'are subject to the terms and conditions of the [2004 RISAP].'" (Doc. No. 1, Ex. A). In the first sentence, the JAMS arbitrator relied on the terms of the RISAP to determine how Natalie's transfer of shares to the Trust affected the voting rights established under the RISAP, and the subsequent quotation from the Trust Agreement in the second sentence was offered only to bolster that conclusion. Hence, this passage supports that, insofar as the JAMS arbitrator looked to the Trust

Agreement, he did so only to confirm what he had already concluded from the RISAP itself.

{¶31} This conclusion can also be drawn from the section of the award in which the JAMS arbitrator stated that the Trust Agreement "expressly recognized" that any shares of Fahey stock transferred out of the Trust would still be subject to the RISAP. Immediately prior to making this comment about the Trust Agreement, the JAMS arbitrator engaged in a construction and application of the RISAP, which he concluded by stating that "any subsequent transfers of [Fahey] stock out of the [Trust] after [Natalie's] death simply do not constitute transfers by her under paragraph 3(b) of the RISAP" that would remove such shares from the voting rights provisions of the RISAP. (*Id.*). Again, the JAMS arbitrator referred to the Trust Agreement only after he separately interpreted and applied the RISAP.

{¶32} Moreover, contrary to Martin's assertion, we do not believe that we can infer that the JAMS arbitrator was interpreting the Trust Agreement from his statement that the Trust Agreement was "clear and unambiguous." A statement that the terms of a document are clear and unambiguous cuts against an inference that the statement-maker interpreted the document because there is no need to interpret unambiguous language. Regardless, when the JAMS arbitrator commented that the language of the Trust Agreement was clear and unambiguous, he was plainly referring to the part of the Trust Agreement providing that Natalie's Fahey interests

were "subject to the terms and conditions of the [2004 RISAP]," which, again, was not the linchpin of the JAMS arbitrator's award. (*See id.*).

{¶33} Finally, we find further evidence for the conclusion that the JAMS arbitrator was not interpreting the Trust Agreement or construing the RISAP and Trust Agreement together in the JAMS arbitrator's apparent disregard of the term of the Trust Agreement providing that "[e]ffective as of [the date of Natalie's death], * * * the one-third shares of * * * Fahey Bank Interests distributable to Carl and Martin no longer constitute 'Subject Shares' as that term is defined in the [RISAP]." (Doc. No. 17, Ex. C). Martin argues that the JAMS arbitrator "analyzed [this] provision, decided that it did not apply to the shares at issue, and made rulings based on that finding." (Appellant's Reply Brief at 3). He also contends that the JAMS arbitrator ignored that provision's "plain language." (*Id.*). Yet, contrary to Martin's assertion, we believe that had the JAMS arbitrator given this language the effect urged by Martin, the JAMS arbitrator would have been doing precisely the thing about which Martin complains—jointly construing the RISAP and the Trust Agreement. The RISAP itself contained a provision defining "Subject Shares," a provision addressing whether transferred shares and the recipient of such shares would be bound by the RISAP, and a provision specifying which transfers would operate to remove shares from the terms of the RISAP. (*See* Doc. No. 1, Ex. B). That is, the RISAP identified which Fahey shares were Subject Shares and the

conditions under which shares would cease to be Subject Shares. Applying the Trust Agreement in the manner suggested by Martin would have required the JAMS arbitrator to conclude that a provision of the Trust Agreement executed by Natalie, a document Martin insists the JAMS arbitrator had no power to interpret or apply, validly modified the terms of a contract entered into between Natalie, Martin, and Carl. The JAMS arbitrator's decision reflects that he avoided conflating the RISAP and the Trust Agreement by deciding what the RISAP required without reference to any potential modifications contained in the Trust Agreement.

{¶34} Having concluded that the JAMS arbitrator's references to the Trust Agreement do not supply a basis for finding that he exceeded his authority, we must now consider the second facet of Martin's first argument—to wit, that the JAMS arbitrator exceeded his authority by "overrul[ing] the decision of a sitting Ohio Marion County judge." (Appellant's Brief at 9). Martin contends that the JAMS arbitrator's award conflicts with the trial court's ruling in the injunction action that "Carl's suspension as a trustee was a legal incapacity which meant that * * * Carl could not vote his half of the shares" at the 2018 annual shareholder meeting. (Id. at 11). He maintains that the JAMS arbitrator exceeded his authority because he nullified and "reversed [the trial court's decision] by retroactively reinstating Carl's voting rights * * *." (Id.).

{¶35} We are not persuaded. In his decision, the JAMS arbitrator did not purport to have the authority to overrule any decision of the trial court. Nor did he claim to overrule the trial court's ruling. Rather, the JAMS arbitrator expressed his disagreement with the trial court's interpretation and application of the RISAP—the very agreement the JAMS arbitrator was empowered to interpret and apply. Furthermore, as Martin had voluntarily dismissed the injunction action by the time the JAMS arbitrator issued his decision, the trial court's ruling in that action was no longer in force. *See Albrecht v. Albrecht*, 11th Dist. Trumbull No. 2017-T-0064, 2018-Ohio-4664, ¶ 19 ("[W]here * * * the underlying action has been dismissed 'without prejudice,' a temporary order imposed therein no longer has any effect."); *Klosterman v. Turnkey-Ohio, L.L.C.*, 10th Dist. Franklin No. 10AP-162, 2010-Ohio-3620, ¶ 12 ("[A] voluntary dismissal without prejudice under Civ.R. 41(A) renders the parties as if no suit had ever been filed. * * * Where the dismissal applies to all defendants, it renders a prior interlocutory ruling a nullity."). Thus, because Martin's dismissal of the injunction action rendered the trial court's preliminary-injunction ruling a nullity, there was no ruling for the JAMS arbitrator to overrule or reverse.[4] Finally, given that Carl was not a party to the injunction action, that

---

[4] By holding that Martin's voluntary dismissal of the injunction action means that there was no existing trial court judgment or ruling for the JAMS arbitrator to overrule or reverse, we do not simultaneously hold that the voluntary dismissal nullified actions taken pursuant to the trial court's preliminary-injunction ruling, i.e., the counting of votes and the conduct of the elections at the rescheduled 2018 annual shareholder meeting. There is some reason to believe that these actions remain valid despite Martin's dismissal of the injunction action. *See Bartlett v. SunAmerica Life Ins. Co.*, 6th Dist. Lucas No. L-09-1124, 2010-Ohio-1884, ¶ 3-5, 16 (in a divorce action where husband was temporarily enjoined from removing his wife as the beneficiary of

Martin voluntarily dismissed the injunction action, and that the trial court's rulings were made in the context of a preliminary injunction, we doubt that it would have been appropriate for the JAMS arbitrator to uncritically follow the trial court's rulings in the injunction action. *See Gessler v. Madigan*, 41 Ohio App.2d 76, 79 (3d Dist.1974) ("[A]n order made granting or denying a preliminary injunction is not conclusive on the issues raised with respect to the granting of the preliminary injunction, or on any of the issues pertaining to the merits of the action."); *Giambrone v. Spalding & Evenflo Co., Inc.*, 2d Dist. Miami No. 96CA08, 1997 WL 189465, *5 (Apr. 18, 1997) (noting that, generally, a voluntarily "dismissed action cannot serve to bar a later action on the grounds of res judicata, collateral estoppel, or law of the [case]."). Accordingly, we cannot conclude that the JAMS arbitrator exceeded his authority simply by issuing an award that conflicts in some respects with the trial court's rulings in the injunction action.

{¶36} Although we have rejected the premises of Martin's first argument, we must still determine whether the JAMS arbitrator's award "draws its essence" from the RISAP. In doing so, we emphasize that we are not deciding whether the JAMS

---

his insurance policies and retirement accounts but proceeded to change the beneficiary designations, subsequent voluntary dismissal of divorce action by husband did not legitimize the beneficiary change because change was made while there was a valid court order in effect prohibiting the change). However, we see no reason why the JAMS arbitrator's authority to interpret and apply the RISAP should be limited by the fact that the 2018 annual meeting was conducted and concluded in accordance with an interpretation and application of the RISAP contained in a now-inoperative ruling. Ultimately, the status of the conduct and results of the rescheduled 2018 annual shareholder meeting is not now before this court for review, and we expressly decline to make any rulings with respect to that issue. A determination of the effect of the JAMS arbitrator's decision, which did not claim to uphold or overturn the results of the annual meeting, and Martin's dismissal of the injunction action on the annual meeting is properly left to future proceedings.

arbitrator correctly interpreted the RISAP and applied it to the circumstances of this case. As long as the JAMS arbitrator arguably interpreted and applied the terms of the RISAP, Martin and Carl must tolerate even serious errors in the JAMS arbitrator's award.

{¶37} With that in mind , we conclude that, irrespective of whether the JAMS arbitrator's interpretation and application of the RISAP was objectively correct, the JAMS arbitrator's award can be rationally derived from the terms of the RISAP. As indicated above, among other things, the RISAP contained terms (1) controlling whether a recipient of Subject Shares transferred by Natalie would be bound by the terms of the RISAP, including the voting rights provisions, and (2) specifying when a transfer would result in shares ceasing to be Subject Shares. In addition, the capacities in which Martin and Carl signed the RISAP, i.e., in their individual capacities or in their representative capacities as co-trustees of the Trust, can be gleaned from the terms of the RISAP. Since the JAMS arbitrator's award was based on his determination of the capacities in which Martin and Carl signed the RISAP, his determination of whether the RISAP dictated that the Subject Shares transferred to the Trust remain subject to the terms of the RISAP, and his determination of whether a transfer of shares out of the Trust would be a type of transfer capable of terminating the "Subject Share" designation under the RISAP, there is some rational nexus between the JAMS arbitrator's award and the RISAP. Accordingly, as the

JAMS arbitrator's award draws its essence from the RISAP, the trial court did not err by determining that the JAMS arbitrator did not exceed his powers or by dismissing Martin's motion to vacate.

{¶38} In his second argument for vacating the JAMS arbitrator's award, Martin argues that the award should be vacated because the JAMS arbitrator misapplied the doctrine of judicial estoppel. However, as Carl notes in his appellate brief, "the JAMS arbitrator * * * cited the doctrine [of judicial estoppel] as an additional and alternative ground (on top of [the RISAP's] plain language) [to] support[] his decision." (Appellee's Brief at 19). Having already concluded that the JAMS arbitrator's award can be rationally derived from the terms of the RISAP, we agree with Carl that "the doctrine of judicial estoppel need not even be considered * * *." (*Id.*).

{¶39} Martin's assignment of error is overruled.

{¶40} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and ZIMMERMAN, J., concur.**

**/jlr**